# IN THE UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

JANE DOE,

*Plaintiff-Appellee,*

v.

GEORGIA DEPARTMENT OF CORRECTIONS, ET AL.,

*Defendants-Appellants.*

On Appeal from the United States District Court for the
Northern District of Georgia, No. 1:23-cv-5578 (Brown, J.)

## OPENING BRIEF OF DEFENDANTS-APPELLANTS

Christopher M. Carr
  *Attorney General*
Stephen J. Petrany
  *Solicitor General*
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
404-458-3408
spetrany@law.ga.gov

Jeffrey M. Harris
Rachael C. Tucker
Thomas S. Vaseliou
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com



*Counsel for Appellants*

June 3, 2024

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Per Rule 26.1 and Circuit Rule 26.1, Appellants certify that the following have an interest in the outcome of this appeal. Only the State Defendants are Appellants before this Court; the remaining Defendants are parties to the district court litigation but are not parties to this appeal:

1. ACLU of Georgia, Amicus Curiae

2. Ausborn, Wil, MHM Defendant

3. Baker Botts LLP, Counsel for Plaintiff

4. Billings, Rhonda, MHM Defendant

5. Boone, Beth, Counsel for Wellpath Defendants

6. Bowling, Donald, MHM Defendant

7. Brown, Hon. Michael L., United States District Judge (N.D. Ga.)

8. Carr, Christopher M., Counsel for State Defendants-Appellants

9. Cassimus, Lindsey, Counsel for MHM Defendants

10. Chalmers, Roger A., Counsel for State Defendants-Appellants

11. Clarke, Jewellann, Wellpath Defendant

12. Cleary, Cathleen, MHM Defendant

13. Consovoy McCarthy PLLC, Counsel for State Defendants-Appellants

14. Dangaran, D., Counsel for Plaintiff-Appellee

15. Doe, Jane, Plaintiff-Appellee

16. Eick, Francesca, Counsel for Plaintiff-Appellee

17. Fox, Melissa Lorraine, Counsel for Amicus Curiae

18. Frankson, Michael G., Counsel for MHM Defendants

19. Georgia Department of Corrections, State Defendant-Appellant

20. Hall Booth Smith, Counsel for Wellpath Defendants

21. Harris, Jeffrey M., Counsel for State Defendants-Appellants

22. Huff Powell Bailey, LLC, Counsel for MHM Defendants

23. Hughes, Aileen Bell, Counsel for Amicus Curiae

24. Jackson, Nora M., Counsel for MHM Defendants

25. James, Latonya, Wellpath Defendant

26. Jane Doe, Plaintiff-Appellee

27. Jeffress, Katherine Elise, Counsel for Plaintiff-Appellee

28. Jones, DeShawn, State Defendant-Appellant

29. Khayat, Jr., Robert C., Counsel for Amicus Curiae

30. Lane, Jeremy, MHM Defendant

31. Lewis, Sharon, State Defendant-Appellant

32. Lohman, Chad I., State Defendant-Appellant

33. Marchand, Sterling Andrew, Counsel for Plaintiff-Appellee

34. Matt, Meghan K., Counsel for Plaintiff-Appellee

35. MHM Correctional Services, LLC, MHM Defendant

36. Montenegro, Tiffiny, Counsel for Wellpath Defendants

37. Moore, Sidney, MHM Defendant

38. Mulloy, Anthony, State Defendant-Appellant

39. Murell, Christopher James, Counsel for Plaintiff-Appellee

40. Murrell Law Firm, Counsel for Plaintiff

41. Nemeth, Miriam R., Counsel for Plaintiff-Appellee

42. Network for Victim Recovery of DC (NVRDC), Amicus Curiae

43. Oliver, Tyrone, State Defendant-Appellant

44. Palmieri III, Nicholas Frank, Counsel for Plaintiff-Appellee

45. Petrany, Stephen J., Counsel for State Defendants-Appellants

46. Rights Behind Bars, Counsel for Plaintiff

47. Roberts, Jamal Kinte, State Defendant-Appellant

48. Ronald, Novak Scott, Counsel for Plaintiff-Appellee

49. Roskey, Hannah, Counsel for Plaintiff-Appellee

50. Sauls, Randy, State Defendant-Appellant

51. Skibinski, Sherri, MHM Defendant

52. Spielmann, Brian, Counsel for Amicus Curiae

53. The Claiborne Firm, Counsel for Plaintiff

54. Tucker, Rachael C., Counsel for State Defendants-Appellants

55. United States, Amicus Curiae

56. Utter, David, Counsel for Plaintiff-Appellee

57. Vaseliou, Thomas S., Counsel for State Defendants-Appellants

58. Vey, Alexander Collins, Counsel for MHM Defendants

59. Wellpath LLC, Wellpath Defendant

Appellants are government officials or entities of the State of Georgia, and

Appellee is an individual. No publicly traded company or corporation has an interest in the outcome of this case or appeal. Per Circuit Rule 26.1-2(c), Appellants certify that this CIP is complete.

Dated: June 3, 2024

/s/ *Jeffrey M. Harris*
Counsel for Defendants-Appellants

## STATEMENT REGARDING ORAL ARGUMENT

Appellants do not think oral argument is necessary because the Eighth Amendment issue is squarely controlled by this Court's precedent, including *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020), and the pseudonymity issue is dictated by well-established principles of public access. But if the Court believes oral argument is necessary, Appellants respectfully request expedited oral argument, as explained in the motion being filed simultaneously with this brief.

# TABLE OF CONTENTS

Certificate of Interested Persons and Corporate Disclosure Statement ............. C-1 of 4

Statement Regarding Oral Argument ................................................................................. i

Table of Authorities ..................................................................................................... iv

Jurisdictional Statement ................................................................................................. 1

Statement of the Issues .................................................................................................. 1

Statement of the Case .................................................................................................... 1

    I.      Plaintiff is an extremely dangerous criminal and inmate. ................................. 3

    II.     Plaintiff is a serial litigator that delayed bringing this suit and seeking a
         preliminary injunction. ............................................................................... 6

    III.   The district court partially grants Plaintiff's request for a preliminary
         injunction. ................................................................................................. 8

Summary of Argument ................................................................................................. 11

Standard of Review ..................................................................................................... 14

Argument ................................................................................................................... 15

    I.      The district court erred in granting a preliminary injunction forcing
         Defendants to provide Plaintiff access to social-transitioning cosmetic
         and clothing items. ................................................................................... 15

        A.    Defendants are not deliberately indifferent to Plaintiff's medical
             needs by refusing to provide access to "feminizing" products. ......... 16

            1.    Prison security and administration concerns defeat Plaintiff's
                request for access to social-transitioning items. ...................... 20

            2.    Social-transitioning cosmetic and clothing items are not
                medically necessary. ................................................................ 26

        B.    Plaintiff cannot establish irreparable injury or that the equities
             favor issuing a preliminary injunction. ........................................... 32

        C.    The PLRA prohibits the preliminary injunction issued by the
             district court. ............................................................................... 35

    II.     The district court clearly and indisputably erred in concluding that
         Plaintiff could proceed pseudonymously. ................................................ 36

Conclusion ................................................................................................................. 43

Certificate of Compliance ............................................................................................ 45

Certificate of Service ........................................................................................................... 45

# TABLE OF AUTHORITIES

## Cases

*Alabama v. U.S. Dep't of Com.,*
546 F. Supp. 3d 1057 (M.D. Ala. 2021) .......................................... 35

*Bethune-Cookman Univ. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n,*
2023 WL 3704912 (11th Cir. May 30) ............................................ 35

*Bettis v. Brown,*
2017 WL 4249722 (S.D. Ga. Aug. 28) ........................................... 43

*Boe v. Marshall,*
No. 2:22-cv-184 (M.D. Ala. Dec. 27, 2022) .................................. 30

*Burger v. Hartley,*
2011 WL 6826645 (S.D. Fla. Dec. 28) ........................................... 35

*Burnette v. Taylor,*
533 F.3d 1325 (11th Cir. 2008) ...................................................... 33

*Cheney v. U.S. Dist. Ct. for D.C.,*
542 U.S. 367 (2004) ........................................................................ 47

*Church v. City of Huntsville,*
30 F.3d 1332 (11th Cir. 1994) ........................................................ 34

*City of Dallas v. Delta Air Lines, Inc.,*
847 F.3d 279 (5th Cir. 2017) ......................................................... 15

*Doe v. Blue Cross & Blue Shield United of Wis.,*
112 F.3d 869 (7th Cir. 1997) ................................................... 44, 45

*Doe v. Drake Univ.,*
2017 WL 11404865 (S.D. Iowa June 13) ...................................... 41

*Doe v. Frank,*
951 F.2d 320 (11th Cir. 1992) ................................................. 39, 40

*Doe v. Reyes 1, Inc.,*
2019 WL 12493582 (M.D. Ga. Aug. 19) ....................................... 45

*Doe v. Stegall,*
653 F.2d 180 (5th Cir. 1981) ......................................................... 39

*Doe v. Trustees of Indiana Univ.,*
--- F.4th ----, No. 22-1576, 2024 WL 1824967 (7th Cir. Apr. 26) .......... 44

*Doe v. Vill. of Deerfield,*
819 F.3d 372 (7th Cir. 2016) ......................................................... 44

*Doe v. Washington Univ.*,
2021 WL 4504387 (E.D. Mo. Sept. 30) ...................................... 41

*Doe v. Washington Univ.*,
652 F. Supp. 3d 1043 (E.D. Mo. 2023) ...................................... 41

*Edmo v. Corizon, Inc.*,
949 F.3d 48 (9th Cir. 2020) ...................................... 11, 30

*Eknes-Tucker v. Gov'r of Ala.*,
80 F.4th 1205 (11th Cir. 2023) ......................................11, 14, 15

*Fisher v. Fed. Bureau of Prisons*,
484 F. Supp. 3d 521 (N.D. Ohio 2020) ...................................... 28, 29

*Gambale v. Deutsche Bank AG*,
377 F.3d 133 (2d Cir. 2004) ...................................... 44

*Gibson v. Collier*,
920 F.3d 212 (5th Cir. 2019) ......................................24, 26, 30, 31

*Goodman v. Kimbrough*,
718 F.3d 1325 (11th Cir. 2013) ...................................... 33

*Great Am. Ins. v. Fountain Eng'g*,
2015 WL 6395283 (S.D. Fla. Oct. 22) ...................................... 35

*Hoffer v. Fla. Dep't of Corr.*,
973 F.3d 1263 (11th Cir. 2020)......................................17, 18, 26, 32, 38

*Hudson v. McMillian*,
503 U.S. 1 (1992) ...................................... 28

*In re Subpoenas Served on AAP*,
23-mc-00004 (D.D.C. 2023) ...................................... 30

*In re: Chiquita Brands Int'l*,
965 F.3d 1238 (11th Cir. 2020)......................................39, 40, 47

*Jackson v. West*,
787 F.3d 1345 (11th Cir. 2015)...................................... 33

*Keohane v. Fla. Dep't of Corr. Sec'y*,
952 F.3d 1257 (11th Cir. 2020).i, 1, 11, 12, 13, 15, 16, 17, 18, 19, 20, 22, 23, 24, 26,
27, 29, 32

*Kosilek v. Spencer*,
774 F.3d 63 (1st Cir. 2014)......................................18, 23, 24, 31, 34

*L.W. ex rel. Williams v. Skrmetti*,
83 F.4th 460 (6th Cir. 2023)...................................... 11

*Luo v. Wang,*
  71 F.4th 1289 (10th Cir. 2023) ........................................................ 43

*Lynn v. Comm'r, Georgia Dep't of Corr.,*
  2020 WL 6054358 (11th Cir. Sept. 30) ........................................... 43

*M.M. v. Zavaras,*
  139 F.3d 798 (10th Cir. 1998) ........................................................ 46

*Mosley v. Zachery,*
  966 F.3d 1265 (11th Cir. 2020) ...................................................... 37

*Pals Grp. v. Quiskeya Trading Corp.,*
  2017 WL 532299 (S.D. Fla. Feb. 9) ............................................... 36

*Plaintiff B v. Francis,*
  631 F.3d 1310 (11th Cir. 2011) ................................................. 40, 46

*Powers v. Nielsen,*
  806 F. App'x 958 (11th Cir. 2020) ................................................. 35

*Raiser v. Church of Jesus Christ of Latter-Day Saints,*
  182 F. App'x 810 (10th Cir. 2006) ................................................. 41

*Snider Tire, Inc. v. Chapman,*
  2021 WL 2497942 (N.D. Ala. Apr. 27) ........................................... 36

*Swain v. Junior,*
  961 F.3d 1276 (11th Cir. 2020) ................................... 15, 17, 36, 37

*Taylor v. Adams,*
  221 F.3d 1254 (11th Cir. 2000) ...................................................... 17

*Tiber Lab'ys, LLC v. Hawthorn Pharms., Inc.,*
  527 F. Supp. 2d 1373 (N.D. Ga. 2007) ........................................... 35

*Trump v. Mazars USA, LLP,*
  591 U.S. 848 (2020) ........................................................................ 26

*United States v. Stoterau,*
  524 F.3d 988 (9th Cir. 2008) .......................................................... 41

*United States v. Varner,*
  948 F.3d 250 (5th Cir. 2020) .......................................................... 11

*Valentine v. Collier,*
  956 F.3d 797 (5th Cir. 2020) .......................................................... 37

*Wreal, LLC v. Amazon.com, Inc.,*
  840 F.3d 1244 (11th Cir. 2016) ...................................................... 34

## Statutes

18 U.S.C. §3626 .......................................................................15, 36, 37

28 U.S.C. §1292 ...............................................................................1

28 U.S.C. §1331 ...............................................................................1

28 U.S.C. §1651 .............................................................................. 46

## Other Authorities

*Volokh, *The Law of Pseudonymous Litigation*,
   73 Hastings L.J. 1353 (2022) ...........................................41, 43, 46

## JURISDICTIONAL STATEMENT

The district court had jurisdiction because Plaintiff alleged that Defendants are violating the Eighth Amendment and other federal laws. 28 U.S.C. §1331. This Court has jurisdiction because Defendants appeal from an order granting injunctive relief. §1292(a)(1). The district court entered that order on April 17, 2024, Doc. 131, and Defendants timely appealed, Doc. 133 (Apr. 25, 2024).

## STATEMENT OF THE ISSUES

1.     Did the district court err in ordering Georgia prison officials to provide the inmate Plaintiff with access to "social transitioning" cosmetic and clothing items (specifically, butt and breast padding and hair-removal cream) to remedy alleged Eighth Amendment violations, notwithstanding this circuit's binding precedent in *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020), that rejects a materially identical claim, Plaintiff's delay of a year to bring the claim, and the Prison Litigation Reform Act's limits on injunctive relief?

2.     Did the district court err by allowing Plaintiff to proceed pseudonymously, including throughout the preliminary-injunction proceedings, despite Plaintiff's prior litigation on closely related matters using Plaintiff's true name and the strong presumption against proceeding pseudonymously?

## STATEMENT OF THE CASE

Plaintiff is a "biologica[l] male" inmate serving a life sentence in a male prison for aggravated sodomy and kidnapping with bodily injury. Doc. 87 at 583. Plaintiff had also previously committed a slew of felonies, including sodomizing a 14-year-old boy.

Recently, while incarcerated, Plaintiff pleaded guilty to conspiring with a known member of a dangerous gang to murder state and federal officials. And even more recently, the federal government indicted Plaintiff for constructing bombs and mailing them to federal buildings.

Since returning to prison in 1992, Plaintiff has sued the State many times, including for sex-transition interventions. In December 2022, Plaintiff filed a materially identical suit in federal court in the Northern District of Georgia only to move to voluntarily dismiss the suit without prejudice a few months later.

A year after dismissing the materially identical suit, Plaintiff filed this suit, claiming that Defendants are violating Plaintiff's Eighth Amendment rights against cruel-and-unusual punishment and other laws. Despite the year delay, Plaintiff immediately sought the drastic and extraordinary remedy of a preliminary injunction, asking the district court to order surgical and hormonal interventions; access to social-transitioning cosmetic and clothing items; and transfer to a women's facility. Doc. 2-3 at 1-2; Doc. 2 at 5. The court denied most of Plaintiff's requests for preliminary-injunctive relief, but nonetheless ordered Defendants to provide Plaintiff access to breast and butt pads and hair-removal cream. Doc. 131. The district court had also previously allowed Plaintiff to proceed anonymously, notwithstanding Plaintiff's extensive prior litigation (including on nearly identical claims) under Plaintiff's legal name. Doc. 75.

## I.    Plaintiff is an extremely dangerous criminal and inmate.

Plaintiff has an extensive criminal history and is serving a life sentence in Georgia state prison. Plaintiff's crimes range from forgery and auto theft to multiple counts of aggravated sodomy, kidnapping, and conspiracy to commit murder. *See* Doc. 87 at 405-45, 608-12.

In June 1988, Plaintiff was arrested for sodomizing a teenager. Doc. 9-4 at 19; Doc. 87 at 405-19, 608-12. Plaintiff was convicted of aggravated sodomy and sentenced to 20 years in prison. *Ibid.* Plaintiff was released on parole on October 1, 1991. *Id.* at 419. It did not last long. Just a few months later, in February 1992, Plaintiff was arrested and charged with kidnapping with bodily injury, false imprisonment, two counts of aggravated sodomy, and impersonating a police officer. *Id.* at 405-19. As Plaintiff has described the crime: "I kidnapped this guy using the police uniform, using the blue strobes, took him back to the apartment where I was staying and sexually assaulted him, and took the uniform off and drove him back to his truck and let him go." *Id.* at 321; *contra id.* at 301 (giving a different story). Plaintiff was convicted on all counts and sentenced to life with parole. *Id.* at 405-19.

Plaintiff continued to engage in serious criminal activity while incarcerated. Plaintiff is known to associate with the white supremacist criminal street gang the Ghostface Gangsters. Jones Decl. (Doc. 86-2) at 8-10 ¶¶26-28. In 2019, Plaintiff and a member of the Ghostface Gangsters conspired to murder a federal inmate. *Ibid.* As part of the conspiracy, Plaintiff and a co-conspirator threatened to murder a former U.S. Attorney

for the Northern District of Georgia and a former Commissioner of the Georgia Department of Corrections, going so far as to mail a letter to the Commissioner's home that suggested he and his family would be killed. *See* Doc. 87 at 421-33; Holt Decl. (Doc. 86-1) at 6-7 ¶¶19-20; Doc. 86-2 at 8-10 ¶¶26-28. Plaintiff ultimately pleaded guilty to seven felonies, including conspiracy to commit murder, terroristic threats, and violations of the Street Gang Terrorism and Prevention Act. Doc. 87 at 421-33. Plaintiff was sentenced to 20 years in prison. *Ibid.*

Plaintiff's disciplinary record while incarcerated reveals a pattern of serious criminal conduct. As recently as 2020, Plaintiff admitted to making and mailing two bombs to the warden of Georgia State Prison. Doc. 86-2 at 8-9 ¶26. Two more bombs were found in Plaintiff's cell. *Id.* at 9-10 ¶28; Doc. 86-1 at 7 ¶20. Plaintiff conspired to escape from prison. *See* Doc. 87 at 447-48. Plaintiff committed "high extortion." *Id.* at 449. And Plaintiff's incarcerated "ex-lover … killed a boy who may have been involved in orchestrating" an alleged attack on Plaintiff. Doe Decl. (Doc. 67-3) at 13-14 ¶32.

In April 2024, Plaintiff was indicted with several felonies for making and mailing "destructive devices" to a federal courthouse and another federal facility. Plaintiff is placed at Phillips State Prison because that facility best fits Plaintiff's security and medical-health profiles.

***Housing.*** Plaintiff has been housed in "Administrative Segregation" since arriving at Phillips State Prison in April 2022.[1] Plaintiff is a close-security offender with a Level III mental-health status, which reflects offenders who suffer from moderate mental illness that impairs their ability to function in the general population. Doc. 86-2 at 11 ¶34; Doc. 86-1 at 3-4 ¶¶7-9, at 7-8 ¶¶23-24. Based on the expertise of prison officials and an individualized assessment of Plaintiff's security and mental-health requirements, the State determined that Phillips is the most appropriate location for Plaintiff at this time. *Id.* at 6-8 ¶¶17-26.

***Medical and Mental History.*** Plaintiff has many medical and mental-health conditions, including bipolar disorder, borderline personality disorder, hypertension, chronic obstructive pulmonary disease, obesity, post-traumatic stress disorder, and obsessive-compulsive disorder. *See* Doc. 67-3 at 91-93 ¶22; Doc. 87 at 621-26. While incarcerated, Plaintiff has received treatment for many health conditions, in addition to specialized treatment for gender dysphoria that has included cross-sex hormones under the close supervision of Plaintiff's medical team. Plaintiff's "[c]omorbidities" like borderline personality and bipolar disorder complicate interventions for gender dysphoria. *E.g.*, Kaliebe Decl. (Doc. 86-7) at 40-42.

---

[1] "Administrative Segregation" critically differs from what laypeople view as "solitary" or "solitary confinement." Administrative Segregation can result in an inmate being in a single cell or one large enough to accommodate a cellmate and is not used for disciplinary purposes. Doc. 86-2 at 4-7 ¶¶13-18. Isolation is used as a form of discipline and involves restrictions on peer contact and personal property. *Id.* at 5 ¶14.

In June 2019, because of concerns over Plaintiff's high blood pressure, Plaintiff agreed to be taken off cross-sex hormones. *E.g.*, Doc. 67-3 at 18 ¶29. Plaintiff restarted cross-sex hormone interventions on April 28, 2023. *Id.* at 38 ¶81. Plaintiff's hormone treatment is overseen by an endocrinologist. Mulloy Decl. (Doc. 86-3) at 5-6 ¶16. Plaintiff's individualized treatment plan for gender dysphoria, which was in place before the filing of this suit and is still in place today, is to monitor Plaintiff's vitals and blood work, including Plaintiff's estrogen and testosterone levels, and Plaintiff's clinicians will adjust Plaintiff's medication as appropriate. *Id.* ¶¶14-17. Plaintiff's individualized treatment plan also includes counseling sessions by a mental-health counselor specifically dedicated to the issue of gender dysphoria, as well as additional sessions by a psychologist on request. Parks Decl. (Doc. 86-4) at 4 ¶¶8-12, at 5 ¶¶14-15; Skibinski Decl. (Doc. 86-5) at 2 ¶5.

## II. Plaintiff is a serial litigator that delayed bringing this suit and seeking a preliminary injunction.

Plaintiff is a serial litigant, having brought more than ten previous lawsuits while incarcerated. *See* Doc. 87 at 577-79 (noting at least eight other cases brought by Plaintiff); *id.* at 581-602 (another case). And Plaintiff has been reprimanded for providing false information in prior filings about Plaintiff's litigation history. *See, e.g., id.* at 577-79 (dismissing complaint because Plaintiff provided false information about prior filing history).

Plaintiff has also filed lawsuits seeking additional cross-sex hormonal medication, sex-reassignment surgery, and "social transitioning" cosmetic and clothing items. *See id.* at 485-579. Plaintiff has continued to file such suits even though Plaintiff entered into a "Release and Settlement Agreement" with the State of Georgia in 2018 that provided Plaintiff with $4,000 as consideration for Plaintiff releasing any "claims" related to "sex-reassignment surgery," "secondary procedures" like "facial feminization," or "specialty consultation regarding any of the aforementioned conditions, treatment, or procedures." *Id.* at 369-75.

Plaintiff even filed a lawsuit materially identical to this one in December 2022. *Id.* at 485-570. After the suit remained pending for three months, Plaintiff moved to voluntarily dismiss the claim without prejudice. *Id.* at 571-75. Though Plaintiff has been represented by current counsel since at least July 2023, Plaintiff did not file this suit until five months later in December 2023, a year after filing the nearly identical suit.

Plaintiff now seeks damages and injunctive relief under the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act. Plaintiff also moved for a preliminary injunction, asking the district court to order sex-reassignment surgery, "adequate" cross-sex hormonal medication, social-transitioning "cosmetic" items, and "a transfer to a women's prison." Doc. 131 at 1-2.

**III.    The district court partially grants Plaintiff's request for a preliminary injunction.**

After a two-day hearing, during which the court allowed Plaintiff to proceed pseudonymously, the district court mostly denied the preliminary-injunction motion but granted Plaintiff relief as to some social-transitioning cosmetic and clothing items, specifically, "access to breast and buttock padding and hair removal cream." Doc. 131 at 53. The court held that Defendants' failure to provide access to those items likely violated the Eighth Amendment. *Ibid.*

First, the court denied Plaintiff's request for "an independent evaluation for" sex-reassignment surgery as "moot" because Plaintiff's internal request to Plaintiff's "treating physician[s]" was "'being processed and will be presented to the Wellpath gender dysphoria committee.'" *Id.* at 16. It also denied Plaintiff's request for surgery because the request was "not yet ripe, as Defendants have not completed the decision-making process and denied [Plaintiff] that surgery." *Id.* at 16-17.

Second, the court denied Plaintiff's "request for a higher dosage of" cross-sex hormonal medication, because "Defendants have been providing that care" and are currently trying "to provide 'adequate feminizing hormone therapy.'" *Id.* at 17. In the end, the court denied Plaintiff's request because as Plaintiff's experts admitted, Plaintiff had not been on the "current dosage" of hormones "long enough to determine whether it is sufficient." *Id.* at 20.

Last, and as relevant for this appeal, the court partially granted Plaintiff's demand for access to social-transitioning cosmetic and clothing items. The court determined that Plaintiff is likely to succeed as to breast and buttock padding and hair-removal cream but not wigs and makeup. *Id.* at 23-26. The court concluded that all the requested social-transitioning items were "medically necessary" because "'they decrease'" a person's "'extreme distress that's associated with gender dysphoria.'" *Id.* at 23. The court saw these items as "interim" measures that Defendants "should provide" access to "while Defendants attempt to get Plaintiff to the right level of" cross-sex hormones. *Ibid.* (brackets omitted).

The court rejected Defendants' arguments that the items were merely "psychologically 'pleasing' to Plaintiff" and that "there is no medical consensus that such items are medically necessary." *Id.* at 26. According to the court, those arguments "miss[ed] the point" because "HRT [hormone-replacement therapy] is necessary" and "the goal of HRT … is to reduce or eliminate Plaintiff's body hair and provide [Plaintiff's] feminizing bodily features." *Ibid.* So "if it is medically necessary to provide Plaintiff with these outcomes—and that there might be some lengthy period of time for the HRT to take effect and achieve those outcomes—cosmetic items that can give Plaintiff some interim relief are also medically necessary." *Ibid.*

The court then addressed the security risk posed by wigs, makeup, padding, and hair-removal cream. It contended, however, that "the only items for which Defendants articulated a security concern were wigs and makeup." *Id.* at 23. Because it "ha[d] no

expertise in prison security," the court "accept[ed] Defendants' judgment that wigs and makeup might make Plaintiff more of a target" and concluded that Defendants' "rational security concern" foreclosed Plaintiff's request for those items. *Id.* at 24.

But for padding and hair-removal cream, the court claimed Defendants "failed to articulate any precise security concern." *Id.* at 25. Never mind that Warden Jones's declaration specifically addresses padding and hair-removal cream. And never mind that Defendants' experts both addressed the security concerns of all the requested social-transitioning items. From this purported "fail[ure]," the court concluded that there is no "good reason" Defendants should not provide Plaintiff access to these items. *Id.* at 27.

Next, the court determined that the remaining preliminary-injunction criteria and the PLRA were met. *Id.* at 28 n.10 (PLRA), 48-53 (irreparable harm and equities). It concluded Plaintiff's "psychological distress" and risk of "severe self-harm" constituted irreparable harm. *Id.* at 49. Though the court agreed that delay can defeat Plaintiff's asserted irreparable harm, it found no delay because "Plaintiff's history of litigation demonstrates [Plaintiff's] desire for medical assistance to cure [Plaintiff's] distress." *Id.* at 50. It then concluded that the equities favored injunctive relief. *Id.* at 51-52. And in a footnote, the court determined that the PLRA was met because ordering access to

padding and hair-removal cream "respects GDC's judgment on security concerns and is narrowly tailored" to Plaintiff's medical needs. *Id.* at 28 n.10.[2]

## SUMMARY OF ARGUMENT

**I.** The district court held that Defendants are likely violating the Eighth Amendment's prohibition on cruel-and-unusual punishment by denying Plaintiff access to "social transitioning" cosmetic and clothing items, namely, butt and breast pads and hair-removal cream. But there is no basis in Eighth Amendment precedent, let alone the Constitution's original public meaning, to conclude that state officials are inflicting cruel-and-unusual punishment by refusing to provide a biological-male prisoner with access to items to appear more "feminine." Especially when these items' medical necessity and efficacy are hotly disputed by the medical community and raise serious security concerns for prison administrators. This Court should reverse.

---

[2] The district court also chided Defendants for not using what the court deemed are "the real words"; suggested that Defendants' terms like "sex-reassignment surgery," "cross-sex hormones," and "social-transitioning items" made it "challenging to [its] assessment of credibility"; and asked Defendants to use "the right words" (*i.e.*, Plaintiff's terms) and Plaintiff's "preferred pronouns." Doc. 124 at 119. But this Court and many other jurists have used the same "neutral" terms Defendants did. *See Edmo v. Corizon, Inc.*, 949 F.3d 489, 491 n.3 (9th Cir. 2020) (O'Scannlain, J., dissental) (calling "sex reassignment surgery" a "neutral" term); *Eknes-Tucker v. Gov'r of Ala.*, 80 F.4th 1205, 1215 (11th Cir. 2023), *en banc pet. filed* ("cross-sex hormones"); *L.W. ex rel. Williams v. Skrmetti*, 83 F.4th 460, 466, 468 (6th Cir. 2023) ("sex-reassignment surgeries" and "cross-sex hormone treatments"); *Keohane*, 952 F.3d at 1272 ("social-transitioning-related accommodations"); *cf. United States v. Varner*, 948 F.3d 250, 256 (5th Cir. 2020) ("[I]f a court were to compel the use of particular pronouns at the invitation of litigants, it could raise delicate questions about judicial impartiality.").

The district court's decision fails to heed this Circuit's binding precedent in *Keohane v. Fla. Dep't of Corr. Sec'y*, 952 F.3d 1257 (11th Cir. 2020). There, this Court rejected a prisoner's materially identical Eighth Amendment claim seeking "social-transitioning-related accommodations." *Id.* at 1272-79. First, this Court concluded that "social-transitioning-related requests" present "obviou[s]" and "serious security concerns," such as the fact "that an inmate dressed and groomed as a female would inevitably become a target for abuse in an all-male prison." *Id.* at 1275. Because the prison officials asserted "'legitimate concerns regarding prisoner safety and institutional security,'" this Court upheld the prison's "prophylactic judgment" that inmates should not have access to social-transitioning cosmetic and clothing items, even if those items are medically necessary. *Id.* at 1276, 1278-79. Second, the Court found no constitutional violation because social-transitioning items are not medically necessary but at most "psychologically pleasing." *Id.* at 1274. An intervention that is "pleasing" is "not nearly close enough" to the constitutional standard of "medical necessity." *Ibid.*

The same is true here. Defendants assert a materially identical security concern to the prison officials in *Keohane* and likewise argue that access to social-transitioning cosmetic and clothing items are not *medically* necessary for purposes of the Eighth Amendment. Indeed, Defendants presented evidence from the Warden of the prison where Plaintiff is housed stating that all the requested items pose serious security concerns, which is why the prison does not permit them. Defendants also submitted two expert declarations from psychiatrists with extensive experience in corrections and

treating adults with gender dysphoria. These experts opined that based on their experience, providing male prisoners with access to "feminizing" cosmetic and clothing products raises security and prison-administration concerns. And both experts opined that social-transitioning items are at most "pleasing" but not "medically necessary." One of those experts is the very same expert this Court credited in *Keohane*.

Yet the district court still entered injunctive relief. It found a likely constitutional violation by discounting *Keohane* and ignoring all of Defendants' evidence. In the court's 53-page opinion, it cites *Keohane* only twice for general Eighth Amendment principles. It never engages with this Court's conclusion that the safety concerns related to social-transitioning cosmetic and clothing items are "obviou[s]" and that prohibiting such items is a "legitimate" security concern that defeats an Eighth Amendment claim. And it never engages with this Court's conclusion that social-transitioning items do not meet the constitutional standard of *medical* necessity. Worse, the district court ignored Warden Jones's declaration stating that "based on [his] experience," Plaintiff's requested items raise security concerns generally and for Plaintiff specifically. Doc. 86-2 at 32 ¶ 38.

In defying *Keohane* and ignoring Defendants' evidence, the district court supplanted state officials' judgment on prison security, even though the court admitted it "ha[s] no expertise in prison security." Doc. 131 at 24. The court overstepped its role and ordered relief, even though circuit precedent rejects a materially identical deliberate-indifference claim and holds that social-transitioning items are not medically necessary.

And the court did all that while giving short shrift to the PLRA and its limitation on injunctive relief.

**II.** Exacerbating the harm to the State and the public is the district court's decision to allow Plaintiff to proceed pseudonymously. Plaintiff is a violent felon with a lengthy record of serious crimes (including while incarcerated) yet is now seeking to override prison officials' security and custodial judgments on the ground that the Constitution provides Plaintiff with a right to social-transitioning interventions. The public has a strong interest in knowing the parties' identities in this important and potentially far-reaching constitutional suit. By contrast, Plaintiff has little, if any, legitimate interest in proceeding anonymously when much of the information Plaintiff and the district court claim is "highly private" has already been disclosed to the public in several of Plaintiff's own legal filings that were submitted using Plaintiff's legal name. Those filings remain publicly available and easily accessible today, thereby vitiating any claim that this information is sensitive or private.

## STANDARD OF REVIEW

This Court "'review[s] the grant of a preliminary injunction for abuse of discretion, reviewing any underlying legal conclusions *de novo* and any findings of fact for clear error.'" *Eknes-Tucker*, 80 F.4th at 1219. "'A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of fact that are clearly erroneous.'" *Ibid.* Because the district court's decision is grounded in legal

errors, review is *de novo*. *City of Dallas v. Delta Air Lines, Inc.*, 847 F.3d 279, 286 (5th Cir. 2017).

To obtain a preliminary injunction, Plaintiff must show four things: (1) a substantial likelihood of success on the merits, (2) imminent or ongoing irreparable harm, (3) the harm to Plaintiff outweighs any harm to Defendants, and (4) the public interest favors relief. *Swain v. Junior*, 961 F.3d 1276, 1284-85 (11th Cir. 2020). A "preliminary injunction is an extraordinary and drastic remedy which should not be granted unless the movant clearly carries the burden of persuasion as to these four prerequisites." *Eknes-Tucker*, 80 F.4th at 1219 (cleaned up). It is "never awarded as of right." *Swain*, 961 F.3d at 1284.

Plaintiff's burden for injunctive relief is at its apex at this stage. Plaintiff's deliberate-indifference claim is subject to the statutory strictures of the PLRA. *See Keohane*, 952 F.3d at 1265 n.3. As a result, Plaintiff cannot obtain any relief without at least showing an Eighth Amendment violation and overcoming the PLRA's significant limitations on prospective relief, such as the need-narrowness-intrusiveness requirement. 18 U.S.C. §3626(a)(1)-(2).

## ARGUMENT

I. **The district court erred in granting a preliminary injunction forcing Defendants to provide Plaintiff access to social-transitioning cosmetic and clothing items.**

The district court erroneously concluded Plaintiff met the four preliminary-injunction criteria and overcame the PLRA. Plaintiff did not show that Defendants are

likely inflicting cruel-and-unusual punishment by not giving Plaintiff access to cosmetic "social transitioning" items. To the contrary, this Court's decision in *Keohane* forecloses Plaintiff's claim. 952 F.3d 1257 (11th Cir. 2020). And even if Plaintiff showed likely success, the district court erroneously concluded that the remaining preliminary-injunction criteria were met: Plaintiff's delay defeats any assertion of irreparable injury, and the equities favor denying relief, given courts' deference to government officials' judgment about prison security. Finally, the PLRA requires a far more robust determination than the district court provided, and in any event, Plaintiff did not satisfy the PLRA's need-narrowness-intrusiveness requirement.

### A. Defendants are not deliberately indifferent to Plaintiff's medical needs by refusing to provide access to "feminizing" products.

Plaintiff asked the district court to order Defendants to provide Plaintiff "with ongoing access to a wig, brassieres, underwear, buttock pads, breast pads, hair removal cream, makeup, and other [social-transitioning] commissary items." Doc. 2-3 at 1-2; *see* Doc. 2 at 5 (same). The district court ordered access only to "buttock pads," "breast pads," and "hair-removal cream." Doc. 131 at 53. It should have ordered none. Refusing to provide access to those items does not violate the Eighth Amendment.

To show that a prison official acted with deliberate indifference to a serious medical need in violation of the Eighth Amendment, a plaintiff must show "an objectively serious need, an objectively insufficient response to that need, subjective awareness of facts signaling the need, and an actual inference of required action from those facts."

*Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). A plaintiff "must show 'subjective recklessness as used in the criminal law.'" *Swain*, 961 F.3d at 1285-86. But "even where prison officials actually knew of a substantial risk to inmate health or safety, they may nonetheless be found free from liability if they responded reasonably to the risk." *Id.* at 1286 (cleaned up).

A plaintiff cannot show an Eighth Amendment violation if a defendant provided "minimally adequate care." *Hoffer v. Fla. Dep't of Corr.*, 973 F.3d 1263, 1277 (11th Cir. 2020). Minimally adequate care is "quite minimal"; it need not "be perfect, the best obtainable, or even very good." *Ibid.* (cleaned up). When a defendant provides this quite minimal medical attention, the defendant has "responded reasonably to the risk, even if the harm ultimately was not averted," lacked "a culpable state of mind," and has not violated the Eighth Amendment. *Swain*, 961 F.3d at 1287 (cleaned up). Similarly, "[a] simple difference in medical opinion … fails to support a claim of cruel and unusual punishment." *Keohane*, 952 F.3d at 1266 (cleaned up).

Officials also do not act with deliberate indifference when they act based on rational security concerns. "[E]ven an outright 'denial of care may not amount to an Eighth Amendment violation if that decision is based in legitimate concerns regarding prisoner safety and institutional security.'" *Id.* at 1276. "As long as prison administrators make judgments balancing security and health concerns that are 'within the realm of reason and made in good faith,' their decisions do not amount to a violation of the

Eighth Amendment." *Kosilek v. Spencer*, 774 F.3d 63, 92 (1st Cir. 2014) (en banc); *accord Keohane*, 952 F.3d at 1275-78.

Here, the district court erred by concluding that Defendants' medical care "is so grossly incompetent, inadequate, or excessive as to shock the conscience." *Hoffer*, 973 F.3d at 1271. Defendants have provided Plaintiff with extensive medical care, including an individualized treatment plan for many medical conditions, including gender dysphoria. Doc. 86-4 at 4 ¶¶8-12, at 5 ¶¶14-15; Doc. 86-5 at 2 ¶5; Doc. 86-3 at 5-6 ¶¶14-17. Among other things, Plaintiff receives routine psychotherapy specifically for gender dysphoria and receives cross-sex hormones overseen by an endocrinologist. *Ibid.* Plaintiff's clinicians are "assessing [Plaintiff's] risk of future harm" and "regularly monitoring and managing" Plaintiff's conditions. *Hoffer*, 973 F.3d at 1272. Such extensive treatment does not come close to the conscience-shocking deficiencies that might violate the Eighth Amendment.

Still, the district court found that Defendants' medical care likely violates the Eighth Amendment because Plaintiff lacks access to social-transitioning cosmetic and clothing items, specifically breast and butt padding and hair-removal cream. That holding flatly contradicts this Court's decision in *Keohane*. There, the prisoner claimed prison officials violated the Eighth Amendment by refusing requests for "social-transitioning-related accommodations." 952 F.3d at 1272. This Court disagreed for two independent reasons, both of which apply with full force here.

First, the Court rejected the Eighth Amendment claim because of "serious security concerns." *Id.* at 1275. As the Court explained, "even an outright 'denial of care may not amount to an Eighth Amendment violation if that decision is based in legitimate concerns regarding prisoner safety and institutional security.'" *Id.* at 1276. That is especially true when, as here, "the inmate has not been refused care entirely, but has instead been given a meaningful course of treatment that includes many (if not all) of the components that [the inmate] originally sought." *Ibid.* The inmate's "social-transitioning-related requests," the Court emphasized, presented "serious security concerns—including, most obviously, that an inmate dressed and groomed as a female would inevitably become a target for abuse in an all-male prison." *Id.* at 1275. At bottom, "the Constitution should [not] be read to prohibit prison authorities from making a prophylactic judgment that housing a transitioning [inmate]—wearing long hair, female undergarments, and makeup—in a men's prison simply poses too grave a threat to institutional security." *Id.* at 1278-79.

Second, the Court rejected the inmate's claim because social-transitioning items are not "medically necessary" but at most "psychologically pleasing." *Id.* at 1274. An intervention that is "pleasing" is "not nearly close enough" to the constitutional standard of medical necessity. *Ibid.* The Constitution does not require "the government—which is to say taxpayers—to fund any medical treatment that is 'psychologically pleasing' to an incarcerated inmate." *Id.* at 1274 n.9. And it was irrelevant that the inmate's expert opined that social-transitioning items were "medically necessary" because "a

simple difference in medical opinion between the prison's medical staff and the inmate as to the latter's diagnosis or course of treatment cannot support a claim of cruel and unusual punishment." *Id.* at 1274 (cleaned up). After all, "prisoners aren't constitutionally entitled to their preferred treatment plan or to medical care that is great, or even very good." *Id.* at 1277. "So long as the care provided isn't so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness, then the Eighth Amendment is satisfied." *Id.* at 1277-78.

### 1. Prison security and administration concerns defeat Plaintiff's request for access to social-transitioning items.

As in *Keohane*, Defendants and their experts have determined that Plaintiff's requested "feminizing" items raise security concerns and risk disrupting prison administration. Doc. 86-2 at 12 ¶38; Doc. 87 at 376-86; Levine Decl. (Doc. 86-6) at 65-66 ¶104; Doc. 86-7 at 42 ¶98; PI Hearing Day 1 Tr. (Doc. 124) at 177-82, 201. Here, as in *Keohane*, the State's judgment is "rationa[l]." 952 F.3d at 1277.

The district court concluded otherwise because, in its view, Defendants "didn't really raise a security concern" over the padding and hair-removal cream. Doc. 131 at 24. There are at least two problems with that conclusion.

**a.** Defendants plainly raised security concerns and submitted evidence supporting those concerns. DeShawn Jones, Warden of Philips State Prison where Plaintiff is housed, explained that, based on his experience, Plaintiff's social-transitioning cosmetic

and clothing items pose security risks such as enticing male offenders to attack the inmate:

> I also have reviewed grievances from Doe related to [Doe's] desire to obtain special items not available in commissary such as breast pads, hair removal cream, and a wig. I denied the grievance because those items do not appear on the male or female commissary list and are not otherwise available to Doe. Likewise, Doe's placement in Administrative Segregation warrants the denial of the request for special items as they can pose security risks that are especially relevant to an offender like Doe with a history of an escape attempt. Based on my experience as Warden of Phillips and my previous experience at other GDC facilities, I believe that providing items to Doe that make [Doe] appear more feminine may have the effect of enticing male offenders in a way that disturbs the orderly operation of the facility and can lead to increased incidents of assault. Overall, it is my judgment that the risk of danger to Doe and/or other offenders outweighs Doe's desire to obtain these items that are not available to anyone else in the facility or GDC custody.

Doc. 86-2 at 32 ¶38.

Warden Jones's opinion involved all the requested "special items," "*such as breast pads, hair removal cream*, and a wig." *Ibid.* (emphasis added). And his judgment was "[b]ased on [his] experience as Warden of Phillips and [his] previous experience at other GDC facilities." *Ibid.*; *see* Jones Deposition (Doc. 96-1) at 129-30. The district court's complete oversight of this evidence is telling. And Warden Jones's declaration stating his experienced judgment about prison security and administration is obviously "rationa[l]." *Keohane*, 952 F.3d at 1277.

But Defendants provided even more evidence, through expert declarations and testimony from psychiatrists with significant correctional experience, including with

gender-dysphoric inmates. As Dr. Levine opined, "allowing padding of a bra or buttock pads risks an inmate hiding contraband or other items without easy detection. And any of the items that increase Plaintiff's feminization might increase the risk of Plaintiff being attacked, requiring prison officials to be more vigilant." Doc. 86-6 at 65-66 ¶104.

Dr. Kaliebe added that providing social-transitioning cosmetic and clothing items, especially in response to threats of self-harm or suicide, could increase self-harm and could also raise serious "fairness concerns" disrupting the delicate prison environment. *E.g.*, Doc. 86-7 at 42 ¶98; Doc. 124 at 182-86. As to self-harm, Dr. Kaliebe explained that "in [his] experience with correctional facilities, inmates frequently use threats of self-harm and suicide to try to obtain concessions from prison officials." Doc. 86-7 at 42 ¶98. Based on that experience, he opined that "[i]t is reasonable for prison administrators to have nearly insurmountable presumptions—if not outright prohibitions—against providing inmates benefits, such as unproven surgeries, special-order items, and housing placements, in response to self-harm or suicide threats in order to discourage false threats." *Ibid.* "In corrections, rewarding self-injury or threats of self-injury tends to increase overall self-harm, both for the individual patient and also within the system." *Ibid.*; *accord* Doc. 124 at 182-86.

As to fairness, Dr. Kaliebe explained that "when people get special treatment within a correctional environment, it often is negative for [the person getting the special treatment] because other people don't like it," causing "ripple effects." *Id.* at 207. That is why, noted Dr. Kaliebe, "people in correctional environments really try to be uniform

in their approach," because "once you grant one thing for a person in a correctional environment, it often makes it hard for you not to grant it for everyone." *Id.* at 182; *accord Keohane*, 952 F.3d at 1263 (noting "clear advantages to maintaining uniformity in a prison setting").

Precedent confirms that Defendants' experts' testimony is relevant and accurate. As the en banc First Circuit explained, yielding to a prisoner's demands based on threats of self-harm "would incentivize the use of suicide threats by prisoners as a means of receiving desired benefits." *Kosilek*, 774 F.3d at 94. This "concern—regarding the unacceptable precedent that would be established in dealing with future threats of suicide by inmates to force the prison authorities to comply with the prisoners' particular demands—cannot be discounted as a minor or invalid claim." *Ibid.* "Such threats are not uncommon in prison settings and require firm rejection by the authorities, who must be given ample discretion in dealing with such situations." *Ibid.* And it is "obviou[s]" that these items "would inevitably" make Plaintiff "a target for abuse in an all-male prison" and hinder "the ability to … detect contraband." *Keohane*, 952 F.3d at 1263, 1275.

Rather than engage with their opinions, the district court merely stated that it "doubt[ed]" Drs. Levine's and Kaliebe's "qualifications to testify about issues of prison security." Doc. 131 at 24. The district court's determination is baseless. Dr. Levine is the same expert who this Court credited in *Keohane* and the en banc First Circuit relied on in *Kosilek*. *See* PI Hearing Day 2 Tr. (Doc. 125) at 328:13-16 ("Dr. Levin[e] … was

the expert in *Keohane*."); Doc. 86-6 at 9 ¶¶17-18; *Kosilek*, 774 F.3d at 77-79, 87-89; *see also Gibson v. Collier*, 920 F.3d 212, 221-22 (5th Cir. 2019) (also relying on Dr. Levine's expertise from *Kosilek*). Dr. Levine has over "five decades of practice treating patients who suffered from gender dysphoria," including decades of experience working at correctional facilities. Doc. 86-6 at 8 ¶16, at 89.

Dr. Kaliebe also has significant experience with correctional facilities and treating adults with gender dysphoria. He has extensive training and experience in "forensic psychiatry" that includes "correctional psychiatry … in a prison environment," has peer-reviewed publications on gender dysphoria, and is a professor at the University of South Florida where he leads two university-based training clinics and "practice[s] and teach[es] forensic psychiatry." Doc. 86-7 at 4-5 ¶¶6-7, at 8-12 ¶¶17-24; *see* Doc. 124 at 168, 188, 209. As part of one of the clinics, Dr. Kaliebe "evaluate[s] and treat[s] adult patients with gender dysphoria." Doc. 86-7 at 5-6 ¶9; Doc. 124 at 188.

In short, both of Defendants' experts have extensive, valuable experience in treating adults with gender dysphoria—including in the correctional context. By contrast, Plaintiff's experts are not qualified to opine on the correctional context. *See* Doc. 124 at 97 ("I don't know much about prisons."); *see also* Doc. 131 at 24 ("The Court, having no expertise in prison security …"). The district court abused its discretion by discounting the experts with relevant experience, while relying on the one expert that concedes insufficient knowledge about prisons and the court's own conception of prison safety.

The district court also claimed that "Defendants did not mention this [security] concern in their brief." Doc. 131 at 24. That is not accurate. Defendants provided expert declarations opining on the matter, relevant portions of those declarations were cited in Defendants' briefing, Defendants provided expert testimony on the issue at the preliminary-injunction hearing, and the issue was discussed at the hearing. *E.g.*, Doc. 86 at 25 (citing Doc. 86-7 ¶104); Doc. 131 at 24 (acknowledging the expert declaration states as much); Doc. 124 at 97 (discussing the security-concern "of putting something in the bra padding or concealing"); Doc. 124 at 182-86.

**b.** Putting aside that Defendants provided unrebutted evidence on security that the district court ignored, the court's analysis improperly switches the burden to Defendants. It is well-established that *a plaintiff* has the burden to show "*all aspects* of his Eighth Amendment claim[s]"—not a defendant. *Hoffer*, 973 F.3d at 1274 (emphasis added). Yet the court required Defendants to provide detailed evidence of a security justification. That is backwards. And the district court's burden-flipping is particularly problematic here because this Court has explained that the security concerns for social-transitioning items are "obviou[s]." *Keohane*, 952 F.3d at 1275.

That is especially true as other States like Florida in *Keohane* have already made the same security judgment on social-transitioning items as Georgia. "No legal authority compels the state, every time a prison inmate demands [social-transitioning items], to undertake the time and expense of assembling a record of medical experts, pointing out what we already know…. There is no reason why—as a matter of either common sense

or constitutional law—one state cannot rely on the universally shared experiences and policy determinations of other states." *Gibson*, 920 F.3d at 224. After all, judges need not be "blind" to what "all others can see and understand." *Trump v. Mazars USA, LLP*, 591 U.S. 848, 867 (2020) (cleaned up). The padding and hair-removal cream raise the "obviou[s]" security concerns this Court and other States have already identified. *Keohane*, 952 F.3d at 1275. Plaintiff never meaningfully tried to rebut these obvious concerns or other States' determinations, and thus did not carry the necessary burden.

At bottom, the district court second-guessed Defendants' and their experts' assessments of security concerns, when in this context, courts must give these assessments "'wide-ranging deference.'" *Ibid.* This error alone requires reversing the district court.

### 2. Social-transitioning cosmetic and clothing items are not medically necessary.

Independently, this Court in *Keohane* rejected the prisoner's claim because social-transitioning items are at most "psychologically pleasing" rather than "medically necessary." *Id.* at 1264. So too here. As Drs. Levine and Kaliebe opined, Plaintiff may find it "pleasing" to have each item (separately or together), but that hardly constitutes medical necessity. Doc. 86-6 at 6 ¶10, at 65-66 ¶¶103-04; Doc. 86-7 at 13 ¶28, at 38-39 ¶¶90-91; Doc. 124 at 184. Dr. Levine—again the expert from *Keohane*—explained: "A padded bra or buttock pads are also not medically necessary (as women have a wide range of body shapes and sizes), but might well lessen the frustration a gender dysphoric

biological male experiences from not being perceived by others as a woman. The same is true with the other requested items." Doc. 86-6 at 65-66 ¶¶103-04.

This makes sense because any alleged benefit or even use of social-transitioning cosmetic and clothing items in the prison context are unproven. The concept of access to these items is out of place here because an inmate does not live in society at large but a secure prison environment. What a person may want or need outside prison says nothing about what that person should have access to in a secure prison environment. That is especially true in this case as many of the products Plaintiff seeks are unavailable to *anyone* in GDC custody, including women. Doc. 87 at 376-86.

"[C]osmetic products are not among the minimal civilized measures of life's necessities, so failure to make them available for purchase in a prison commissary is not a violation of [Plaintiff's] Eighth Amendment rights." *Fisher v. Fed. Bureau of Prisons*, 484 F. Supp. 3d 521, 534 (N.D. Ohio 2020) (cleaned up). "Because routine discomfort is part of the penalty that criminal offenders pay for their offenses against society, only those deprivations denying the minimal civilized measure of life's necessities are sufficiently grave to form the basis of an Eighth Amendment violation." *Hudson v. McMillian*, 503 U.S. 1, 9 (1992) (cleaned up). So "[p]rison officials do not violate the Eighth Amendment by denying inmates with [gender dysphoria] unfettered access to all their desired 'social-transitioning requests.'" *Fisher*, 484 F. Supp. 3d at 534 (brackets omitted).

The district court, however, disagreed, adopting Plaintiff's experts' testimony. Doc. 131 at 22-23. But there are two critical flaws to adopting Plaintiff's view.

**1.** For the notion that social-transitioning cosmetic and clothing items are medically necessary, Plaintiff's experts primarily rely on the World Professional Association for Transgender Health ("WPATH") "Standards of Care." These purported "standards" are at most mere guidelines formed by an advocacy group and supported by low-quality evidence, and surely cannot be used to establish constitutional standards of medical care. At the very least, a "difference in medical opinion" exists, which "cannot support a claim of cruel and unusual punishment." *Keohane*, 952 F.3d at 1274 (cleaned up).

To start, WPATH's current version of the "Standards of Care," like its earlier versions, has "come under [evidence-based medicine] EBM scrutiny and ha[s] been recognized as biased, inherently contradictory, consensus-based, and erroneously claiming to be evidence-based." Doc. 86-6 at 57-58 ¶93. Even WPATH's own document acknowledges its questionable evidentiary support. For example, in the adult-assessment section, the standards state that "the empirical evidence base for the assessment of" transgender-identifying "adults is limited." Doc. 87 at 115-16. And elsewhere the standards state that the "intervention-specific risks associated with the presence of specific physical conditions have not been well researched." *Id.* at 121. "While entitled 'Standards of Care,' they actually do not meet the higher standards required to employ this scientific phrase; they are guidelines only." Doc. 86-6 at 5 ¶7; *see* Doc. 86-7 at 12 ¶26, at 18-32 ¶¶42-75; Doc. 124 at 169-72, 181-84, 214-16.[3]

---

[3] WPATH's "Standards of Care" are particularly unreliable because they are not "politically neutral." *Gibson*, 920 F.3d at 222 (cleaned up). "WPATH aspires to be both

WPATH's standards are even more unreliable when it comes to prisoners. WPATH recommended that sex-transition interventions, including social-transitioning items, "should be provided to prisoners as in the community ... *before* any inmate had" such interventions. Doc. 86-6 at 5 ¶7. In fact, when WPATH published the current version of the standards, "few inmates in the U.S. had ever received [sex-transition interventions]," and experts who "had written about the special challenges of this population were ignored." *Id.* at 58-59 ¶94; *see* Doc. 86-7 at 33-35 ¶¶78-80, at 36-37 ¶¶84-85; Doc. 124 at 183-84. As Dr. Kaliebe explained, there is no "evidence base" for WPATH's recommendations on social-transitioning cosmetic and clothing items; the recommendations "were made based on WPATH's preference for how this is really treated in an outpatient or regular environment," and "they sought to bring outpatient sort of paradigms into institutional environments." Doc. 124 at 181; *see id.* at 182-83 ("[T]here's never been a study done within a correctional environment to monitor and figure out what the results are and does this really work, you know, is it really going to make things better or what other problems might it cause."). And contra Plaintiff's experts, WPATH's standards are not clear-cut. WPATH itself makes clear that its

---

a scientific organization and an advocacy group for the transgendered," and "[t]hese aspirations sometimes conflict." *Ibid.* (cleaned up); *see, e.g., Edmo*, 949 F.3d at 495 (O'Scannlain, J., dissental). WPATH even holds itself out as an advocacy group. When the State of Alabama subpoenaed WPATH in 2022, WPATH called itself an "advocacy organizatio[n]" shielded from public disclosure. *Boe v. Marshall*, No. 2:22-cv-184, ECF 208 at 3 (M.D. Ala. Dec. 27, 2022); *see In re Subpoenas Served on AAP*, 23-mc-00004 (D.D.C. 2023) (resisting subpoena on same grounds), *appeal filed*, 23-7025 (D.C. Cir. 2023).

standards are "recommendations" that are "flexible," "adaptable," and "may [be] modif[ied]." Doc. 87 at 94; *e.g.*, *id.* at 97, 114 (same).

At bottom, WPATH cannot dictate constitutional standards under the Eighth Amendment. "Prudent medical professionals … do reasonably differ in their opinions regarding [WPATH's] requirements." *Kosilek*, 774 F.3d at 88. WPATH's guidelines "reflect not consensus, but merely one side in a sharply contested medical debate," involving social-transitioning interventions. *Gibson*, 920 F.3d at 221.

**2.** Plaintiff has also suggested that medical necessity "is a very low bar" and includes anything "that treats a condition." Doc. 125 at 339:22-23 (Plaintiff's counsel); *see id.* at 336:7 ("not a high bar"); *id.* at 335:24-336:6 ("Medical necessity is simply treatment that is needed to diagnose or treat an illness, injury, condition, disease or its symptoms and that meets accepted standards of medicine."). Plaintiff's expert defined "[m]edically necessary" as "a diagnostic or treatment modality that benefits a patient in the form of either curing disease, *decreasing pain or improving general function*, that is based on widely accepted medical standards." Doc. 124 at 79:3-6 (Dr. Lowell) (emphasis added); *accord* Lowell Decl. (Doc. 67-3) at 63 ¶24 ("Gender-affirming healthcare is medically necessary—in other words, needed to diagnose or treat an illness, injury, condition, disease or its symptoms and that meets accepted standards of medicine." (cleaned up)); Lowell Reply Decl. (Doc. 90-1) at 59 ¶93 (same); *id.* at 48 ¶70 (similar). In that expert's view, "[a] wig is as medically necessary for [a transgender-identifying] patient as it would be for a [woman] who had survived cancer." *Id.* at 47 ¶64.

Plaintiff's conception of *medical* necessity is clearly not the law. The Constitution does not require "the government—which is to say taxpayers—to fund any medical treatment that is 'psychologically pleasing' to an incarcerated inmate." *Keohane*, 952 F.3d at 1274 n.9. "'[P]sychologically pleasing'" is "not nearly close enough" to "medically necessary." *Id.* at 1274 & n.9. "Necessity, not pleasure, is the constitutional standard." *Ibid.* Drs. Levine and Kaliebe offered expert opinions that precisely align with this Court's analysis in *Keohane* (in which Dr. Levine also served as an expert): Social-transitioning clothing and cosmetic items are at most pleasing, not *medically* necessary. *E.g.*, Doc. 86-6 at 65 ¶103; Doc. 86-7 at 13 ¶28, at 38-39 ¶¶90-91.

In sum, the district court committed the very fallacy this Court has repeatedly warned against: It "impermissibly evaluated" the treatment "against a negligence (or perhaps even more lenient) benchmark" and "lost track" of "the stringency of the deliberate-indifference standard." *Hoffer*, 973 F.3d at 1271. The Constitution does not require the medical care to be "'perfect, the best obtainable, or even very good.'" *Ibid.* Officials violate the Eighth Amendment only when the care "'is so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Ibid.* That is plainly not the case here.

\* \* \*

At the very least, the above arguments show that the district court erred in concluding that Defendants met the deliberate-indifference test's subjective component. Indeed, the district court erred at the outset by analyzing Defendants collectively rather

than individually. *E.g.*, Doc. 131 at 2 n.1. For deliberate-indifference claims, "'[e]ach individual Defendant must be judged separately and on the basis of what that person knows.'" *Jackson v. West*, 787 F.3d 1345, 1353 (11th Cir. 2015); *accord, e.g.*, *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2008) (same). The district court failed to do the proper analysis, which alone requires vacating the injunction.

In any event, Plaintiff failed to show that any of the Defendants were both "aware of facts from which the inference could be drawn that a substantial risk of serious harm exists" and "dr[e]w the inference." *Goodman v. Kimbrough*, 718 F.3d 1325, 1332 (11th Cir. 2013). Plaintiff likewise failed to do the individualized analysis required to show deliberate indifference. *See* Doc. 2-1 at 16-20; Doc. 90 at 10-12. And regardless of the district court's (erroneous) determination on medical necessity, Defendants "remai[n] entitled to reasonably rely" on Defendants' experts' opinions that social-transitioning items are not medically necessary and Plaintiff's treatment team's decision not to order such cosmetic and clothing items. *Kosilek*, 774 F.3d at 92 n.14. So too with prison officials' and other experts' determinations that these items raise "security concerns." *Ibid.*

## B. Plaintiff cannot establish irreparable injury or that the equities favor issuing a preliminary injunction.

Plaintiff's failure to show likely success alone requires reversing the district court. *See, e.g.*, *Church v. City of Huntsville*, 30 F.3d 1332, 1342 (11th Cir. 1994) ("Because we conclude that the plaintiffs failed to establish a substantial likelihood of success on the

merits, we will not address the three other prerequisites of preliminary injunctive relief."). But it is not the only defect. Even if Plaintiff were likely to succeed on the merits, the court erroneously concluded that Plaintiff showed irreparable harm and that the equities favor injunctive relief.

*Irreparable Harm.* Plaintiff's significant delay in seeking preliminary-injunctive relief is fatal to Plaintiff's motion, or at the very least, strongly "militates against a finding of irreparable harm." *Wreal, LLC v. Amazon.com, Inc.*, 840 F.3d 1244, 1248 (11th Cir. 2016); *Powers v. Nielsen*, 806 F. App'x 958, 959 (11th Cir. 2020) (same).[4] Plaintiff filed a materially identical lawsuit in December 2022. Doc. 87 at 485-570. Three months later, Plaintiff moved to voluntarily dismiss the claim without prejudice. *Id.* at 572-75.

Plaintiff cannot plausibly allege irreparable harm requiring *immediate* intervention when Plaintiff previously initiated and then withdrew litigation seeking materially identical relief. Especially when Plaintiff waited nearly a year after withdrawing to file this suit. That delay is far longer than what has doomed injunctive relief in other cases. *See, e.g., Bethune-Cookman Univ. v. Dr. Mary McLeod Bethune Nat'l Alumni Ass'n*, 2023 WL

---

[4] *See, e.g., Burger v. Hartley*, 2011 WL 6826645, at *2 (S.D. Fla. Dec. 28) ("Delay before seeking a preliminary injunction may standing alon[e] preclude the granting of preliminary injunctive relief." (cleaned up)); *Great Am. Ins. v. Fountain Eng'g*, 2015 WL 6395283, at *4 (S.D. Fla. Oct. 22) ("[A] delay in bringing suit may defeat a presumption of irreparable harm."); *Tiber Lab'ys, LLC v. Hawthorn Pharms., Inc.*, 527 F. Supp. 2d 1373, 1381 (N.D. Ga. 2007) ("Where the movant 'unduly delayed in bringing suit,' however, 'thereby negating the idea of irreparability,' a preliminary injunction should not issue."); *Alabama v. U.S. Dep't of Com.*, 546 F. Supp. 3d 1057, 1073 (M.D. Ala. 2021) ("[B]y sitting on his or her rights for even a few months, a plaintiff has squandered any corresponding entitlement to injunctive relief." (collecting cases)).

3704912, at *3 (11th Cir. May 30) (six months); *Snider Tire, Inc. v. Chapman*, 2021 WL 2497942, at *5 (N.D. Ala. Apr. 27) (four months); *Pals Grp. v. Quiskeya Trading Corp.*, 2017 WL 532299, at *6 (S.D. Fla. Feb. 9) ("[C]ourts typically decline to grant preliminary injunctions in the face of unexplained delays of more than two months." (collecting cases)).

The district court never meaningfully explained how Plaintiff's delay is consistent with its grant of a preliminary injunction. Instead, the court found no delay. According to the court, Plaintiff voluntarily dismissed its 2022 case because "one of [Plaintiff's] new doctors at Phillips recommended [Plaintiff] be evaluated for 'potential gender affirming surgical intervention.'" Doc. 131 at 50. But the court is talking about a different case, and in any event, the court found that no doctor has recommended evaluation for surgery. *See* Doc. 87 at 368-75; Doc. 131 at 8 n.2. Plaintiff has not explained this year-long delay, particularly as to the request for access to social-transitioning items.

***Balance of the Equities and Public Interest.*** Where, as here, "the government is the party opposing the preliminary injunction, its interest and harm merge with the public interest." *Swain*, 958 F.3d at 1091. Here, the harm to Defendants and the public far outweighs the speculative harm to Plaintiff. *See* 18 U.S.C. §3626(a)(2) ("The court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the preliminary relief and shall respect the principles of comity…."). And the State's interest in prison administration strongly favors denying injunctive relief. "[I]t is difficult to imagine an activity in which a State has a stronger

interest, or one that is more intricately bound up with state laws, regulations, and procedures, than the administration of its prisons." *Swain*, 958 F.3d at 1090 (cleaned up); *accord Valentine v. Collier*, 956 F.3d 797, 803 (5th Cir. 2020) (same). "Because of the extraordinary difficulty in running a prison, prison administrators should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." *Mosley v. Zachery*, 966 F.3d 1265, 1273 (11th Cir. 2020) (cleaned up).

## C. The PLRA prohibits the preliminary injunction issued by the district court.

Under the PLRA, Plaintiff cannot obtain any relief without at least showing a federal constitutional or statutory violation. *See* 18 U.S.C. §3626(a)(1)-(2). As explained, Plaintiff has not done so. Plaintiff also must show that the proposed preliminary-injunctive relief meets the need-narrowness-intrusiveness requirement: *i.e.*, the relief is "narrowly drawn," "extend[s] no further than necessary to correct the harm," and is "the least intrusive means necessary to correct that harm." §3626(a)(2).

In briefing, Plaintiff never tried to surmount the PLRA for social-transitioning items, even though it is Plaintiff's burden to carry. Remarkably, Plaintiff did not mention the PLRA in any of the extensive briefing, even though Defendants invoked it at every turn.

The district court also gave the PLRA short shrift. The court, in a single footnote, concluded that the relief it was ordering satisfies the PLRA. Doc. 131 at 28 n.10. But the PLRA requires more than such a barebones determination. *See Hoffer*, 973 F.3d at 1278 ("The district court's one-sentence, boilerplate paragraph here regarding PLRA compliance was 'seriously deficient.'"). In all events, the district court was flatly wrong that its injunction "respects GDC's judgment on security concerns and is narrowly tailored to provide Plaintiff with something Defendants *agree* is medically necessary to treat [Plaintiff's] gender dysphoria." Doc. 131 at 28 n.10. The district court did not respect Defendants' security judgments; it disregarded them, as explained above.

## II. The district court clearly and indisputably erred in concluding that Plaintiff could proceed pseudonymously.

The district court permitted Plaintiff to proceed anonymously in this case, despite Plaintiff's extensive prior litigations against prison officials that publicly identify Plaintiff by name and offer extensive details about Plaintiff's gender dysphoria, medical history, mental health, and alleged mistreatment by guards and other inmates. *See* Doc. 75. But Plaintiff has no plausible basis to proceed anonymously when much of the information Plaintiff and the district court claim is "highly private" has already been disclosed to the public in several of Plaintiff's own legal filings submitted using Plaintiff's legal name. *See id.* at 3. This Court should order Plaintiff to file legal-name versions of all documents in this Court and the district court.

Federal Rule of Civil Procedure 10 states that "[t]he title of the complaint must name all the parties." Fed. R. Civ. P. 10(a). "'Generally, parties to a lawsuit must identify themselves' in the pleadings." *In re: Chiquita Brands Int'l*, 965 F.3d 1238, 1247 (11th Cir. 2020). The strong general rule that parties must use their legal name "serves more than administrative convenience" and is "more than a customary procedural formality." *Doe v. Frank*, 951 F.2d 320, 322 (11th Cir. 1992); *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. 1981). To the contrary, the rule "protects the public's legitimate interest in knowing all of the facts involved, including the identities of the parties," *Frank*, 951 F.2d at 322, and vindicates the public's "First Amendment guarantees," *Stegall*, 653 F.2d at 185. For these reasons, it "is the exceptional case in which a plaintiff may proceed under a fictitious name." *Frank*, 951 F.2d at 323; *see Chiquita Brands*, 965 F.3d at 1247 ("Parties may use fictitious names only in exceptional cases." (cleaned up)). There is "a strong presumption in favor of parties' proceeding in their own names." *Plaintiff B v. Francis*, 631 F.3d 1310, 1315 (11th Cir. 2011). "The ultimate test for permitting a plaintiff to proceed anonymously is whether the plaintiff has a substantial privacy right which outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings." *Frank*, 951 F.2d at 323 (internal quotation marks omitted).

The district court clearly erred in concluding that "disclosure of Plaintiff's identity will require disclosure of highly private information," which outweighed any interest on the other side. Doc. 75 at 3. Whatever weight privacy might carry in the abstract, Plaintiff has no cognizable privacy interest here because much of the information

Plaintiff and the district court claims to be "highly private" has already been placed in the public domain *in Plaintiff's own publicly available legal filings*. It is well-established that "where the identity of a litigant has been revealed—whether in the litigation *or otherwise*—courts have found that any weight in favor of pseudonymity stemming from the above factors diminishes or evaporates entirely." *Doe v. Washington Univ.*, 652 F. Supp. 3d 1043, 1046 (E.D. Mo. 2023) (emphasis added).[5]

Plaintiff is a serial litigant who has filed many prior complaints under Plaintiff's own name, including at least two unsuccessful suits requesting additional treatments for gender dysphoria. *E.g.*, Doc. 87 at 485-607; Docs. 63-1–4. The public filings in those cases—which are readily available today on PACER or Westlaw—specifically identify Plaintiff as transgender-identifying and provide extensive discussion of Plaintiff's

_____

[5] *See also, e.g.*, *United States v. Stoterau*, 524 F.3d 988, 1013 (9th Cir. 2008) ("Stoterau's conviction is a matter of public record, and many of the documents in his case were not submitted under seal. Therefore, the use of a pseudonym in this disposition will have limited effect in concealing the fact that Stoterau was convicted of transporting child pornography."); *Raiser v. Church of Jesus Christ of Latter-Day Saints*, 182 F. App'x 810, 811 (10th Cir. 2006) ("In cases where the sensitive information has already been disclosed during a party's prior litigation under its real name, the social interest in allowing a party to proceed anonymously is limited."); *Doe v. Washington Univ.*, 2021 WL 4504387, at *2 (E.D. Mo. Sept. 30) (rejecting motion to proceed anonymously because the plaintiff "chose to proceed in [a] different cour[t] under his true name" and because "even if the Court granted this motion, its ruling would be readily subject to evasion because any member of the public could quickly locate the dockets of [the other] case"); *Doe v. Drake Univ.*, 2017 WL 11404865, at *4 (S.D. Iowa June 13) ("Because of the prior and ongoing disclosure of Plaintiff's identity, much of the contemplated harm in unveiling [Plaintiff's] identity has already occurred and this Court is unable to mitigate the damage from the previous disclosures."); Volokh, *The Law of Pseudonymous Litigation*, 73 Hastings L.J. 1353, 1394 n.193 (2022) (collecting other cases).

medical and mental-health history, alleged prior instances of sexual assault, Plaintiff's request for sex-reassignment surgery, and history of incarceration. *Ibid.*

For example, in one case, Plaintiff publicly filed a ten-page declaration detailing Plaintiff's childhood, experience with gender dysphoria, medical history (including both gender dysphoria and other medical issues), and previous treatments while in Georgia state prison. Doc. 60-1. And in another case, Plaintiff's complaint uses Plaintiff's legal name, alleges a violation of the Eighth Amendment for failure to protect, states Plaintiff identifies as transgender, and describes Plaintiff's alleged history of sexual assault while incarcerated. *See* Doc. 60-2. In these filings, and many others, Plaintiff voluntarily discloses into the public domain most of the same information that Plaintiff and the district court claims to be "highly private." This shows the district court's grant of Plaintiff's request to proceed pseudonymously is clearly and indisputably wrong.[6]

Other considerations clearly outweigh whatever remains of Plaintiff's claimed interests in proceeding anonymously. For example, "[c]ourts and litigants often recognize that a litigant in the case before them is vexatious by searching for past cases filed by the litigant in various courts. That becomes impossible or at least much harder if the past cases were pseudonymous." Volokh, *supra*, at 1390 (footnotes omitted); *see id.* at

---

[6] Plaintiff has also filed other suits that identify Plaintiff by name, disclose that Plaintiff is in Georgia state prison, and seek relief for alleged mistreatment by guards or prison officials. *See, e.g.*, Doc. 60-3 (identifying eight other suits filed by Plaintiff). Further, in the public filing in the district court, Plaintiff discusses a prior suit resulting in a jury award of $200,000 that could easily be linked to Plaintiff's identity with minimal diligence. *See, e.g.*, Doc. 60-4; Doc. 2-1 at 11.

1390-91 & nn.172-74 (collecting cases); *Luo v. Wang*, 71 F.4th 1289, 1302-03 (10th Cir. 2023). This is particularly important when, as here, the plaintiff is a prisoner with a significant history of litigation who has misrepresented that history in the past. *See* Doc. 60-3 (dismissing complaint for providing false information about filing history); *see also, e.g.*, *Bettis v. Brown*, 2017 WL 4249722, at *1-2 (S.D. Ga. Aug. 28) (dismissing prisoner's complaint for "provid[ing] false information about his prior filing history in his complaint" and noting that "[t]he practice of dismissing a case as a sanction for providing false information about prior filing history is … well established in the Southern District of Georgia"); *Lynn v. Comm'r, Georgia Dep't of Corr.*, 2020 WL 6054358, at *2 (11th Cir. Sept. 30) (affirming such a dismissal).

The district court claims that it does not matter that Plaintiff has revealed Plaintiff's name to the world in connection to materially identical facts and similar claims because Plaintiff "represented herself in all those cases." Doc. 75 at 3. Even if Plaintiff proceeded pro se, that fact is irrelevant. "The genie is out of the bottle," so courts have no basis "to put the genie back." *Gambale v. Deutsche Bank AG*, 377 F.3d 133, 144 (2d Cir. 2004). That is true even when disclosure is "the district court's error"—let alone the party's own decision. *Ibid.* The district court provided no support for the idea that representation affects anonymity.

The district court also relied on the fact that "disclosure of [Plaintiff's] identity here will necessarily result in additional disclosure (or republication) of" certain information. Doc. 75 at 3-4. But the district court's point proves pseudonymity is baseless

here: That disclosure will result in "*additional* disclosure" or "*re*publication" proves that the information is already readily available to the public. *Ibid.* (emphases added).

In any event, mere "social stigma" cannot justify anonymity. *See Doe v. Trustees of Indiana Univ.*, --- F.4th ----, No. 22-1576, 2024 WL 1824967, at *3 (7th Cir. Apr. 26) (""[W]e have refused to allow plaintiffs to proceed anonymously merely to avoid embarrassment.""). Plaintiff's "fear of disclosure of his medical and psychiatric information through litigation [i]s insufficient to warrant the plaintiff's anonymity." *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016); *accord Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997) ("[T]he fact that a case involves a medical issue is not a sufficient reason for allowing the use of a fictitious name, even though many people are understandably secretive about their medical problems."). And neither Plaintiff nor the district court explained how case-by-case sealing or protective orders about specific information militates the concerns compared to complete anonymity. *See ibid.* ("Should John Doe's psychiatric records contain material that would be highly embarrassing to the average person yet somehow pertinent to this suit and so an appropriate part of the judicial record, the judge could require that this material be placed under seal." (cleaned up)).

It is also no answer to say that Plaintiff's fear of retaliation justifies anonymity. As the district court noted, all the relevant individuals know who Plaintiff is and the supposedly private information. Doc. 75 at 5. "Plaintiff has not identified a group of individuals who pose an actual risk to [Plaintiff]." *Id.* at 5-6. And "whether Plaintiff

would be compelled to disclose information 'of the utmost intimacy,' the threat of hostile public reaction to the lawsuit by itself is rarely sufficient to warrant public anonymity." *Doe v. Reyes 1, Inc.*, 2019 WL 12493582, at *1 (M.D. Ga. Aug. 19).

The district court also said that the fact Plaintiff "challenges government action" supports proceeding anonymously. Doc. 75 at 4. Not so. The presence of government actors counsels *against* anonymity: "The public has a strong interest in knowing the accusations against its tax-funded entities as well as the identities of the individuals making those accusations. The public's interest weighs heavily against anonymity because the defendants are public servants who stand accused of a gross abuse of power." Volokh, *supra*, at 1392 (cleaned up); *see, e.g.*, *M.M. v. Zavaras*, 139 F.3d 798, 803 (10th Cir. 1998) ("[W]e believe that the prejudice to the public interest is clear, should the district court have allowed plaintiff to proceed under a fictitious name. Plaintiff's claim to relief clearly involves the use of public funds, and the public certainly has a valid interest in knowing how state revenues are spent."). Plaintiff has litigated many other cases against Defendants publicly and there would be little (if any) harm to Plaintiff from litigating this case under Plaintiff's true name.[7]

---

[7] Of course, Defendants are willing to work with Plaintiff to ensure sealing of truly private information like certain medical records, but there is no basis for Plaintiff to proceed under a pseudonym.

*          *          *

In short, the district court clearly erred in granting Plaintiff's motion to proceed pseudonymously. Many of the very same allegations Plaintiff and the district court contend are "highly private" have already voluntarily been placed in the public domain. Concerns about already public information do not overcome the "strong presumption" against anonymity, *Francis*, 631 F.3d at 1315, or make this case one of the "exceptional cases" permitting anonymity, *Chiquita Brands*, 965 F.3d at 1247 (cleaned up). Defendants' and the public's interests thus clearly and indisputably outweigh Plaintiff's purported interest in anonymity.[8]

## CONCLUSION

For these reasons, the Court should reverse the district court's partial grant of Plaintiff's preliminary-injunction motion and determination that Plaintiff can proceed pseudonymously. The Court should remand with instructions to deny the preliminary-injunction motion in full and order Plaintiff to file legal-name versions of all documents.

---

[8] Shortly before the filing of this brief, Plaintiff filed a "motion to dismiss the appeal for lack of jurisdiction" regarding the pseudonymity issue. ECF 25-1, No. 24-11382 (May 23, 2024). Defendants will respond to Plaintiff's jurisdictional challenge in their opposition to that motion and in it, explain why this Court has jurisdiction over the anonymity issue, conditionally cross-move to unseal the appellate record, and alternatively, explain why, to the extent there is any doubt as to jurisdiction, this Court should view Defendants' arguments as a petition for a writ of mandamus and grant the petition, *see, e.g.*, 28 U.S.C. §1651; *Cheney v. U.S. Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004).

Dated: June 3, 2024

Respectfully submitted,

Christopher M. Carr
  *Attorney General*
  Georgia Bar No. 112505
Stephen J. Petrany
  *Solicitor General*
  Georgia Bar No. 718981
Georgia Department of Law
40 Capitol Square SW
Atlanta, Georgia, 30334
404-458-3408
spetrany@law.ga.gov

*/s/ Jeffrey M. Harris*
Jeffrey M. Harris
Rachael C. Tucker
Thomas S. Vaseliou
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
rachael@consovoymccarthy.com
tvaseliou@consovoymccarthy.com

*Counsel for Appellants*

## CERTIFICATE OF COMPLIANCE

This brief complies with Rule 32(a)(7) because it contains 11,039 words, excluding the parts that can be excluded. This brief also complies with Rule 32(a)(5)-(6) because it is prepared in a proportionally spaced face using Microsoft Word 2016 in 14-point Garamond font.

Dated: June 3, 2024                    _/s/ Jeffrey M. Harris_____


## CERTIFICATE OF SERVICE

I filed this brief on the Court's electronic filing system, which will email everyone requiring notice.

Dated: June 3, 2024                    _/s/ Jeffrey M. Harris_____