No. 24-11382

# UNITED STATES COURT OF APPEALS
# FOR THE ELEVENTH CIRCUIT

===

**JANE DOE,**
*Plaintiff-Appellee,*

*v.*

**GEORGIA DEPARTMENT OF CORRECTIONS, ET AL.,**
*Defendants-Appellants.*

===

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
CASE NO. 1:23-CV-5578 (MLB)

===

## PLAINTIFF-APPELLEE'S ANSWERING BRIEF

===

D Dangaran
Miriam R. Nemeth
RIGHTS BEHIND BARS
416 Florida Avenue NW # 26152
Washington, DC 20001
(202) 455-4399
d@rightsbehindbars.org
miriam@rightsbehindbars.org

Scott Novak
BAKER BOTTS, L.L.P.
700 K St NW
Washington, DC 20001
(202) 639-1316
scott.novak@bakerbotts.com

Katie Jeffress
BAKER BOTTS, L.L.P.
401 S 1st Street Suite 1300
Austin, Texas 78704
(512) 322-2672
katie.jeffress@bakerbotts.com

Nicholas F. Palmieri
BAKER BOTTS, L.L.P.
30 Rockefeller Plaza
New York, New York 10112
(212) 408-2640
nick.palmieri@bakerbotts.com

*Counsel for Plaintiff-Appellee Jane Doe*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

Pursuant to 11th Cir. R. 26.1, the undersigned certifies that no publicly traded company or corporation has an interest in the outcome of the case or appeal. The undersigned has previously entered this information into the web-based stock ticker symbol CIP, indicating that there is nothing to declare, and that web-based certification remains accurate as of the submission of this motion.

The undersigned further certifies that the Defendants-Appellants' previously submitted Certificate of Interested Persons, Dkt. 7, accurately lists the name of each person, attorney, association of persons, firm, law firm, partnership, and corporation that has or may have an interest in the outcome of this action, with the exception of one defendant that joined the matter before the trial court (but is not part of this appeal) after Defendants-Appellants filed their brief, and the following parties that have since notified the undersigned of their interested involvement as *amici curiae* before this court:

[Parties 1 through 59 from Dkt. 7, repeated in Dkt. 26, adopted]

60.  Centurion of Georgia LLC, Defendant (not part of this Appeal)

61.  Gee, Seran, Counsel for Interested Amicus Curiae in this Appeal

62.  Medley, Shayna, Counsel for Interested Amicus Curiae in this Appeal

63.  Buchert, Sasha, Counsel for Interested Amicus Curiae in this Appeal

64.  Loewy, Karen, Counsel for Interested Amicus Curiae in this Appeal

65.  American Medical Women's Association, Interested Amicus Curiae in this Appeal

66.  GLMA: Health Professionals Advancing LGBTQ+ Equality, Interested Amicus Curiae in this Appeal

67.  National Association of Social Workers, Interested Amicus Curiae in this Appeal

68.  The World Professional Association for Transgender Health, Interested Amicus Curiae in this Appeal

69.  National Center for Lesbian Rights, Interested Amicus Curiae in this Appeal

70.  The National LGBTQ Task Force, Interested Amicus Curiae in this Appeal

71.  Florida Institutional Legal Services Project of Florida Legal Services, Interested Amicus Curiae in this Appeal

Dated: August 2, 2024

*/s/ D Dangaran*
D Dangaran
Rights Behind Bars
416 Florida Avenue NW #26152
Washington, DC 20001
*Attorney for Plaintiff-Appellee Jane Doe*

## STATEMENT REGARDING ORAL ARGUMENT

Plaintiff-Appellee and her counsel request oral argument in this case for four reasons.

1.    Although Appellants' opening brief presents only two legal issues, this case contains a third threshold jurisdictional question of significance. *See* Dkt. 27. This Court may benefit from argument on appellate jurisdiction to iron out Defendants' three-pronged approach to the pseudonym issue.

2.    As responding to Plaintiff's motion, Defendants cross-moved to unseal the record. Dkt. 29 at 11–13. And Defendants filed an alternative writ of mandamus seeking the *extraordinary* relief to unseal matters on the record that have been sealed by the district court. *Id.* at 13–15. Unsealing the record and using Plaintiff's name on appeal would drastically alter the status quo ordered by the district court. *See generally* Dkt. 33 (Plaintiff's Response to motion to unseal). Oral argument would allow Plaintiff to respond to the Court's questions before it takes this extraordinary step.

3.    Defendants ask this Court to find that the district court abused its discretion in granting a preliminary injunction order. Defendants have provided the gender-affirming items at issue to Plaintiff. If this Court reverses the order, Defendants would very likely seize the items that have been provided, which would cause further suffering to Plaintiff, particularly now that she has experienced living with the benefits of these items. Disturbing this preliminary order therefore bears the potential

consequence of bringing serious harm to Plaintiff, including an escalation of her self-injurious behavior to cope with her distress.

4. This case asks the Court to clarify the scope of *Keohane v. Florida Department of Corrections Secretary*, 952 F.3d 1257 (11th Cir. 2020), as well as the extent to which the Prison Litigation Reform Act's ("PLRA") need-narrowness-intrusiveness requirement for injunctive relief bars the district court's order. This Court may benefit from argument before interpreting the Eighth Amendment or PLRA in a way that would bear significant implications across the circuits.

Plaintiff opposes Defendants' request for expedited oral argument because the items granted by the district court's preliminary injunction order are narrowly tailored, specific, and not intrusive to the functioning of the Georgia Department of Corrections. *See generally* Dkt. 32.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT..............................................................II

STATEMENT REGARDING ORAL ARGUMENT ..........................................IV

TABLE OF CONTENTS..................................................................VI

TABLE OF CITATIONS .................................................................VIII

JURISDICTIONAL STATEMENT .................................................... 1

STATEMENT OF THE ISSUES.......................................................... 2

STATEMENT OF THE CASE .............................................................. 3

   I. PLAINTIFF'S ALLEGATIONS............................................................ 4

   II. ORDER GRANTING LEAVE TO PROCEED USING A PSEUDONYM ............................ 8

   III. PRELIMINARY INJUNCTION............................................................ 9

     A. *Expert Opinions*............................................................ 9

     B. *Preliminary Injunction Hearing* ................................. 12

     C. *Findings of Fact and Conclusions of Law*..................... 13

   IV. CURRENT STAGE OF PROCEEDINGS ................................. 20

SUMMARY OF THE ARGUMENT.................................................. 20

STANDARD OF REVIEW ................................................................ 23

I.   ORDER GRANTING LEAVE TO PROCEED USING A PSEUDONYM .......................... 23

II.  WRIT OF MANDAMUS ...................................................................... 24

III. PRELIMINARY INJUNCTION.............................................................. 24

**ARGUMENT** ................................................................................ **25**

I.   THIS COURT SHOULD NOT DISTURB THE PSEUDONYM ORDER. ............................ 27

   A. *This Court lacks jurisdiction to review the pseudonym order.*...................... 27

   B. *Mandamus is not warranted to overturn the pseudonym order.* ................... 29

II.  THIS COURT SHOULD AFFIRM THE PRELIMINARY INJUNCTION ORDER................. 33

   A. *Plaintiff met her burden for a preliminary injunction.*.................................. 33

      1. *Keohane* did not ban gender-affirming commissary items. ....................... 38

      2. Defendants presented no rational security risks of the items ordered........ 40

      3. There was no undue delay barring injunctive relief. .................................. 45

   B. *The relief granted meets the PLRA's requirements.*...................................... 47

**CONCLUSION**................................................................................ **50**

# TABLE OF CITATIONS

CASES                                                                  PAGE(S)

*Allied Chem. Corp. v. Daiflon, Inc.*,

    449 U.S. 33 (1980) ................................................................................... 24

*Am. Beverage Corp. v. Diageo N.A.*,

    936 F. Supp. 2d 555 (W.D. Pa. 2013) .................................................. 45

*Bayse v. Philbin*,

    No. CV-122-024, 2024 WL 695414 (S.D. Ga. Feb. 20, 2024) ......................... 41

*Benisek v. Lamone*,

    585 U.S. 155 (2018) ................................................................................... 46

*Boldface Licensing + Branding v. Tillett*,

    940 F. Supp. 2d 1178 (C.D. Cal. 2013) ............................................... 45

*Brown v. Maxwell*,

    929 F.3d 41 (2d Cir. 2019) ................................................................... 33

*Brown v. Plata*,

    563 U.S. 493 (2011) ................................................................................... 48

*Burnette v. Taylor*,

    533 F.3d 1325 (11th Cir. 2018) ........................................................................ 35

*Cafe 207, Inc. v. St. Johns County*,

    989 F.2d 1136 (11th Cir. 1993) .................................................................. 4, 25

*Callaway v. Block*,

    763 F.2d 1283 (11th Cir. 1985) ........................................................................ 28

*Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*,

    112 F.3d 1125 (11th Cir. 1997) ........................................................................ 25

*Cheney v. U.S. Dist. Court*,

    542 U.S. 357 (2004) ............................................................................... 24, 30

*Chess v. Dovey*,

    790 F.3d 961 (9th Cir. 2015) ..................................................................... 40, 41

*Chi. Tribune Co. v. Bridgestone/Firestone*,

    263 F.3d 1304 (11th Cir. 2001) ................................................................. 32, 33

*De'lonta v. Johnson*,

    708 F.3d 520 (4th Cir. 2013) ........................................................................... 39

*Doe v. Frank*,

    951 F.2d 320 (11th Cir. 1992) ........................................................... 31

*Doe v. Neverson*,

    820 F. App'x 984 (11th Cir. 2020) ........................................... 21, 31

*Doe v. Stegall*,

    653 F.2d 180 (5th Cir. Unit A 1981) ................................................ 29

*Edmo v. Corizon, Inc.*,

    935 F.3d 757 (9th Cir. 2019) ........................................................... 42

*Gonzalez v. Governor of Ga.*,

    978 F.3d 1266 (11th Cir. 2020) ....................................................... 25

*Gore v. Sec'y for Dep't of Corr.*,

    492 F.3d 1273 (11th Cir. 2007) ....................................................... 38

*Henderson v. Thomas*,

    891 F. Supp. 2d 1296 (M.D. Ala. 2012) .......................................... 48

*Hicklin v. Precynthe*,

    No. 4:16-CV-01357-NCC, 2018 WL 806764 (E.D. Mo. Feb. 9, 2018) ............ 15

*Hoffer v. Sec'y, Fla. Dep't of Corr.*,

   973 F.3d 1263 (11th Cir. 2020) ....................................... 17, 36, 48, 49

*Hudson v. McMillian*,

   503 U.S. 1 (1992) ............................................................... 34

*In re Alexander Grant & Co. Litig.*,

   820 F.2d 352 (11th Cir. 1987) ........................................... 33

*In re Chiquita Brands Int'l*,

   965 F.3d 1238 (11th Cir. 2020) .......................................... 23, 24, 31

*In re Clerici*,

   481 F.3d 1324 (11th Cir. 2007) .......................................... 24

*In re Coffman*,

   766 F.3d 1246 (11th Cir. 2014) .......................................... 24

*In re Sec'y, Fla. Dep't of Corr.*,

   No. 20-10650-J, 2020 WL 1933170 (11th Cir. Mar. 30, 2020).................. 21, 33

*Jackson v. West*,

   787 F.3d 1345 (11th Cir. 2015) .......................................... 35

*Johnson v. Breeden*,

    280 F.3d 1308 (11th Cir. 2002) ........................................................ 48

*Johnson v. Lewis*,

    83 F.4th 1319 (11th Cir. 2023) ....................................................... 44

*Kallstrom v. City of Columbus*,

    136 F.3d 1055 (6th Cir. 1998) ....................................................... 31

*\*Keohane v. Fla. Dep't of Corr. Sec'y*,

    952 F.3d 1257 (11th Cir. 2020) ............................... 22, 38, 39, 41, 44

*Kosilek v. Spencer*,

    774 F.3d 63 (1st Cir. 2014) ........................................................... 41

*Kotteakos v. United States*,

    328 U.S. 750 (1946) ...................................................................... 43

*Larweth v. Magellan Health, Inc.*,

    841 F. App'x 146 (11th Cir. 2021) ............................................... 46

*Lynch v. Ward*,

    No. 5:21-CV-461, 2022 WL 2392868 (M.D. Ga. July 1, 2022) ....................... 27

*Merilien v. Warden*,

    No. 21-12415, 2023 WL 5846294 (11th Cir. Sept. 11, 2023) .......................... 35

*Metlife, Inc. v. Fin. Stability Oversight Council*,

    865 F.3d 661 (D.C. Cir. 2017) ........................................................... 33

*Nixon v. Warner Commc'ns, Inc.*,

    435 U.S. 589 (1978) ........................................................................ 32

*Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*,

    740 F.2d 892 (11th Cir. 1984) ......................................................... 25

*S.B. v. Fla. Agric. & Mech. Univ. Bd. of Trustees*,

    823 F. App'x 862 (11th Cir. 2020) ............................................ 28, 30

*Siegel v. LePore*,

    234 F.3d 1163 (11th Cir. 2000) ....................................................... 25

*Solantic, LLC v. City of Neptune Beach*,

    410 F.3d 1250 (11th Cir. 2005) ................................................. 28, 29

*Soneeya v. Mici*,

    --- F. Supp. 3d ----, 2024 WL 550171 (D. Mass. 2024).................................... 41

*State of Florida v. Dep't of Health & Hum. Servs.*,

    19 F.4th 1271 (11th Cir. 2021) ........................................................ 24

*Swain v. Junior*,

    961 F.3d 1276 (11th Cir. 2020) ................................................ 17, 34

*Taylor v. Adams*,

    221 F.3d 1254 (11th Cir. 2000) ........................................................ 34

*Thomas v. Bryant*,

    614 F.3d 1288 (11th Cir. 2010) ........................................................ 34

*Transcon. Gas Pipe Line Co. v. 6.04 Acres, More or Less, Over Parcel(s) of Land of*

    *Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049*,

    910 F.3d 1130 (11th Cir. 2018) ........................................................ 28

*United States v. Frazier*,

    387 F.3d 1244 (11th Cir. 2004) (en banc) ........................................ 43

*United States v. Lundgren*,

    729 F. App'x 873 (11th Cir. 2018) .................................................... 38

*United States v. Shalhoub*,

    855 F.3d 1255 (11th Cir. 2017) ................................................ 23, 24

*Walker v. Jones*,

    10 F.3d 1569 (11th Cir. 1994) ........................................................... 35

*Wood v. Fla. Dep't of Educ.*,

    --- F. Supp. 3d ----, No. 4:23-cv-526, 2024 WL 1536749 (N.D. Fla. April 9, 2024)

    ........................................................................................................ 45, 46

*Wreal, LLC v. Amazon.com, Inc.*,

    840 F.3d 1244, 1247–48 (11th Cir. 2016) ..................................... 45, 46

**STATUTES**

18 U.S.C. § 3626(a)(1)(A) ................................................................ 47, 48

28 U.S.C. § 1292(a)(1) ............................................................................ 1

28 U.S.C. § 2111 .................................................................................. 43

**OTHER AUTHORITIES**

Fed. R. App. P. 4(a)(1)(A) .................................................................. 1, 28

Fed. R. App. P. 21(b) ............................................................................. 2

Fed. R. Civ. P. 61 ................................................................................. 43

Sandy E. James *et al.*, National Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* 198 (2016)........................................................ 32

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 because Plaintiff alleged violations of the Eighth Amendment, the Americans with Disabilities Act, and the Rehabilitation Act. This Court has jurisdiction over Defendants' timely appeal of the district court's preliminary injunction order. 28 U.S.C. § 1292(a)(1).

This Court lacks jurisdiction over Defendants' appeal of the district court's separate order granting Plaintiff leave to proceed using a pseudonym and file documents revealing her identity under seal. *See* Appellants' Appendix ("AA") Volume 1, Dkt. 31-1 at 54.[1] Defendants do not timely appeal the district court's order, which was issued January 12, 2024. *See* Fed. R. App. P. 4(a)(1)(A) (issuing 30-day deadline for interlocutory appeals). This Court's jurisdiction over the preliminary injunction does not extend to this separate order; Defendants have waived any argument under the collateral-order doctrine or pendent jurisdiction that may have provided otherwise and instead erroneously assert that the pseudonym order is intrinsically part of the preliminary-injunction order.

---

[1] Plaintiff refers to CM/ECF entries on the appellate docket with the abbreviation "Dkt." Plaintiff cites the district court docket using the page numbers from Appellants' Appendix ("AA") or Plaintiff-Appellee's Supplemental Appendix ("PSA") per Local Rule 28(e). Because the Appellants' Appendix is not consecutively paginated across volumes and because the sealed volumes are not filed on CM/ECF, Plaintiff refers to the appellate docket number (e.g., Dkt. 31-1) or specific sealed volume as necessary.

## STATEMENT OF THE ISSUES

1.     Whether this Court has jurisdiction over an untimely interlocutory appeal of a district court order granting Plaintiff leave to proceed under a pseudonym, when that order has no bearing on the merits of the preliminary injunction properly on appeal.

2.     Whether this Court should grant the extraordinary relief of a writ of mandamus to review the district court's well-reasoned order granting an incarcerated transgender Plaintiff leave to proceed under a pseudonym, where Plaintiff's name is known to the district court and all parties in the case, but Plaintiff seeks to preserve her privacy in the public eye given the sensitive information at issue.[2]

3.     Whether the district court abused its discretion in reviewing individualized assessments of Plaintiff's medical needs (made by her treating physicians employed by Defendant Georgia Department of Corrections or their contractors, as well as three of Plaintiff's expert witnesses who evaluated her), concluding that Plaintiff has a substantial likelihood of success on the merits of her medical deliberate indifference claims, and ordering Defendants to provide her access to two specific gender-affirming

---

[2] It is unclear to Plaintiff whether this Court will provide Plaintiff another opportunity to brief this issue, given that Defendants have requested this writ of mandamus as an argument in the alternative of their opening brief. Dkt. 29 at 13–15; *cf.* Fed. R. App. P. 21(b) (noting that the Court "must order the respondent . . . to answer within a fixed time"). Out of an abundance of caution, and because Defendants have (unjustifiably) accused Plaintiff of forfeiting a response to the writ despite Plaintiff's clear statements regarding Plaintiff's view of appellate procedure, Plaintiff responds to the writ now. *See* Dkt. 30 at 1 n.1; Dkt. 35 at 8.

items (hair removal cream and buttock/breast padding) that (1) alleviate her severe symptoms of gender dysphoria, (2) help attain the intended effects of her currently inefficacious medication that Defendants have prescribed her to change her physical features and thus treat her severe gender dysphoria, and (3) pose no credible security risk.

## STATEMENT OF THE CASE

Before the Court is an appeal of a preliminary injunction issued under the Eighth Amendment. Plaintiff Jane Doe is a transgender woman in the custody of the Georgia Department of Corrections ("GDC"). Dkt. 31-3 at 7. Last December, Plaintiff filed her complaint, raising injunctive claims to obtain gender-affirming medical care and reasonable accommodations as well as damages claims to remedy past wrongs, including the delay and denial of necessary care or safety measures. Dkt. 31-2 at 129–36. With her complaint, Plaintiff filed separately a motion for preliminary injunction and a motion to proceed under a pseudonym. *See* Dkt. 31-1 at 18–19.

Plaintiff brought suit under 42 U.S.C. § 1983 and the Eighth Amendment, alleging claims of medical deliberate indifference, Dkt. 31-2 at 177–86, failure-to-protect, *id.* at 198–201, 203–05, and unconstitutionally prolonged solitary confinement, *id.* at 201–03. Plaintiff also alleged disability discrimination claims under the Americans With Disabilities Act and the Rehabilitation Act based on her disability of gender dysphoria. *Id.* at 186–98. Gender dysphoria is "a serious medical condition

characterized by a clinically significant and persistent feeling of distress and discomfort [that some transgender people feel] with the gender they were identified as at birth (their 'assigned gender' or 'birth-assigned sex')." PSA-95.

Plaintiff named GDC and five of its officials as defendants, along with Plaintiff's medical and mental-health providers, all of whom were private contractors with GDC. *Id.* at 129–36.[3] Here, Plaintiff states only those facts relevant to this appeal, given the more circumscribed standard of review on appeal of a preliminary injunction. *See Cafe 207, Inc. v. St. Johns County*, 989 F.2d 1136, 1137 (11th Cir. 1993) ("No attention is paid to the merits of the controversy beyond that necessary to determine the presence or absence of an abuse of discretion." (cleaned up)).[4]

## I.    Plaintiff's Allegations

Plaintiff has been serving a life sentence in GDC since 1992. Dkt. 31-3 at 8. She has wanted gender-affirming surgery since around 1988. PSA-45. GDC diagnosed her with a "gender identity disorder" in 1993 and 1994,[5] and she received a gender

---

[3] Only GDC and its officials have appealed before this Court.

[4] Plaintiff therefore does not discuss her failure-to-protect, solitary confinement, or disability discrimination claims. Plaintiff's preliminary injunction request for transfer to a women's facility was denied by the district court, and her solitary confinement claim was not raised in the preliminary injunction motion. Such claims are Plaintiff's *only* claims that would warrant Defendants' long recitation of Plaintiff's criminal history. Plaintiff's criminal record has no bearing whatsoever on the necessary medical care she should be provided.

[5] This is an outdated diagnosis that was removed from the DSM in 2013; in that revision, gender dysphoria was added to the DSM as a diagnosis. *See* PSA-95–96.

dysphoria diagnosis from GDC medical contractors in 2015. PSA-45. She has been on hormone replacement therapy ("HRT") since early 2016. Dkt. 31-3 at 9. Ms. Doe's endocrinologist, Defendant Anthony Mulloy, previously prescribed her a significant enough dosage of estradiol, a feminizing hormone, that she developed breasts, her facial and body hair was suppressed, and her body fat redistributed around her thighs, hips, and buttocks. *Id.* She felt that her distress from gender dysphoria lessened because of these changes. *Id.* But she "still wanted gender-affirming surgery to remove [her] testicles." PSA-53.

Ms. Doe's primary care physician discontinued her HRT in 2019 over fears of her hypertension and age. Dkt. 31-3 at 9. She filed around 25 sick call requests over the next two years attempting to see Dr. Mulloy to restart HRT, and she continued making requests into 2022. PSA-55, 57, 60–61. The feminizing effects of HRT quickly began to wear off after her treatment was discontinued, and her body reverted to a more masculine form, leaving her with severe depression. Dkt. 31-3 at 9–10; *see* Dkt. 31-2 at 149 ¶ 80 (describing changes to her facial and chest hair, sex parts, and fatty tissue around her thighs, hips, and buttocks). Ms. Doe began to slam her head against the wall every day to prevent thoughts of self-castration or suicide, in an effort to cope with her gender dysphoria. *See* Dkt. 31-2 at 151 ¶ 86.

Throughout 2022, Ms. Doe submitted requests for various gender-affirming surgeries, including an orchiectomy, breast augmentation surgery, laser hair removal,

and bodily and facial feminizing surgeries. *Id.* at 152. She also requested gender-affirming items that would help to control her secondary sex characteristics in a similar fashion as the HRT did. *Id.* Specifically, she submitted medical requests for "feminizing commissary items like breast and buttock pads, hair removal cream, and a wig," all of which GDC denied. Dkt. 31-3 at 12.

Defendant Cleary, a psychiatrist, evaluated Plaintiff in February 2022 and then referred her again to Defendant Dr. Mulloy, the endocrinologist. Dkt. 31-2 at 153. Due to unreasonable delay caused by GDC and Wellpath staff, Plaintiff was unable to meet with Dr. Mulloy until April 2023. *Id.* During this period, as she repeatedly requested access to surgery consultations and HRT, she suffered from worsening symptoms of gender dysphoria, conducting self-injurious behavior and ultimately attempting self-castration in July 2022. *Id.* at 153–57. Plaintiff became suicidal when mental health staff told her they were unable to perform a psychological assessment for gender-affirming surgery because of GDC's functional blanket ban on these procedures. *Id.* at 154. In June 2022, Defendant Bowling told her that if she "were to attempt self-castration again, maybe while at the hospital, they'll just go ahead and cut your gonads out." *Id.* at 156 ¶ 107. Plaintiff then did just that, attempting self-castration and suffering through the extremely painful consequences for a month thereafter. *See id.* at 157 ¶ 109–11. She still feels the impact of the self-castration attempt today. *See id.* at 157–58 ¶ 111.

After Plaintiff attempted self-castration, two psychiatrists employed by GDC or their contractors, Drs. Howard and Frady, evaluated her gender-affirming care needs; Dr. Frady evaluated Ms. Doe once in July 2022, then Dr. Howard met with her twice later that year. *Id.* at 158–59 ¶ 114; *see also* PSA-343–50 (SEALED) (three evaluation reports). Dr. Howard found Plaintiff capable of pursuing gender-affirming surgery, noting that her "comorbid psychiatric issues . . . are not actively distracting her from appreciating the benefits, risks, and realities surrounding gender affirming treatment." Dkt. 31-2 at 159 ¶ 116–17.[6] Dr. Howard found that "affording her basic accommodations impacting her gender appearance may translate to a significant reduction in self-injurious behavior and minimize [her] notable distress related to her gender identity." Dkt. 31-2 at 159 ¶ 116. By Plaintiff's recollection, Dr. Frady recommended on January 3, 2023, in front of Defendant Skibinski, that Plaintiff receive gender-affirming items such as breast pads, buttock pads, and surgery. *Id.* at 159–60 ¶ 119–20; *see* PSA-353 (SEALED). Dr. Frady's evaluation stated that he recommended "further medical assessment by specialty providers." Dkt. 31-3 at 14.

Despite these evaluations, Ms. Doe's treatment committee at her facility denied her various requests for gender-affirming care, bluntly informing her that GDC

---

[6] *But see* Appellants' Opening Brief ("AOB") at 5 (stating the opposite based on speculative discussion from their expert, Dr. Kristopher Kaliebe, who has never evaluated Ms. Doe, and completely omitting Dr. Howard's evaluation from their statement of facts).

"doesn't do gender-affirming surgeries." Dkt. 31-2 at 160–61 ¶ 121–23. She filed a grievance following that denial. *See* PSA-354–56 (SEALED).

Nearly four months later, Plaintiff was finally permitted to restart testosterone blockers. *See* Dkt. 31-2 at 161–62 ¶ 124–25. Dr. Mulloy told Ms. Doe that she would begin to see the feminizing effects of hormone therapy only after she received 20 mg of estradiol every two weeks, but he refused to give her that dose. *Id.* at 162 ¶ 16. Although Dr. Mulloy put her back on a much smaller dose of estradiol on April 28, 2023, she has yet to see any feminizing effects. *See id.* at 161–62. In treating Ms. Doe, Dr. Mulloy has ignored the fact that her body is not reacting to the hormone therapy with physiological changes. *Id.* at 163–64

## II.    Order Granting Leave to Proceed Using a Pseudonym

At the time of filing her complaint, Ms. Doe sought "to proceed anonymously, file documents that disclose her name under seal, and limit disclosure of her identity to defense counsel and certain senior GDC employees." Dkt. 31-1 at 49. The district court granted this motion in part. *Id.* Applying the relevant test for rebutting the presumption of disclosing party names in judicial proceedings, the district court discussed the relevant factors in a reasoned opinion, using the proper totality-of-the-circumstances inquiry. *Id.* at 50. The district court determined that "it is appropriate to shield Plaintiff's identity from the public," but that "Defendants need not withhold Plaintiff's identity from individuals who are responsible for her medical care, who are

directly involved in the wrongdoing she alleges, or who have relevant information regarding Plaintiff's claims." *Id.* at 53. The Court issued its order on January 12, 2024. *Id.* at 54. Defendants did not file a motion for reconsideration or attempt to file an interlocutory appeal.

## III.   <u>Preliminary Injunction</u>

In her motion for preliminary injunction, Plaintiff sought "(1) an evaluation for gender-affirming surgery (and, if indicated, the surgery itself), (2) adequate hormone replacement therapy, (3) gender-affirming commissary items, and (4) a transfer to a women's prison." Dkt. 31-3 at 7–8. The district court denied all but her request for certain gender-affirming items. *Id.* at 2; *see also id.* at 21–27 (setting forth the district court's reasoning for granting Ms. Doe's requests for hair removal cream and padding).

### A.   <u>Expert Opinions</u>

Plaintiff included three expert declarations from specialists in gender-affirming medical care with her motion for preliminary injunction. PSA-91–201. Each expert witness met with Plaintiff via video conference and evaluated her medical needs through that interview and a review of her medical records. PSA-92, 117–18, 160.

Dr. Isabel Lowell found that "Ms. Doe clearly meets the DSM-V's diagnostic criteria for gender dysphoria" and that Plaintiff's history of hormone therapy as provided by GDC fell below the standard of care. PSA-103–04, 110. Dr. Lowell

discussed the "masculinizing physical changes that have significantly exacerbated [Ms. Doe's] gender dysphoria." PSA-104. Dr. Lowell found that "[t]o treat Ms. Doe's gender dysphoria, it is imperative and urgent that Ms. Doe have consistent, uninterrupted access to hair removal products, such as shaving products and hair removal cream." PSA-111. Dr. Lowell said, "[t]he growth of body hair for a transgender woman like Ms. Doe causes her extreme psychological distress and exacerbates her gender dysphoria in a manner that could be life-threatening." *Id.* Further, Dr. Lowell found that Ms. Doe needed "to pad her bra so that she can present as her true gender" until she "develops additional breast tissue" and that GDC should allow her access to "butt padding until she achieves feminizing fat redistribution." PSA-111–12. In her expert opinion, these items were "medically necessary, imperative, and urgent." PSA-112.

Similarly, Dr. J. Sonya Haw found it "obvious . . . that it is medically necessary that Ms. Doe receive both medical and surgical gender-affirming therapies to fully alleviate her gender dysphoria." PSA-130. Dr. Haw, an endocrinologist and specialist in transgender medicine and diabetes care (PSA-118), also found it "obvious . . . that [Ms. Doe] has not been treated by providers with expertise in gender-affirming care." PSA-129. She found that "it was not necessary to have ever stopped hormonal therapy for Ms. Doe" and that her "past removal from hormone therapy treatment was conducted in a manner that defies medically acceptable standards of care." PSA-130.

Dr. Jens Berli is the only surgeon whose evaluation of Ms. Doe is part of the record on appeal. *See* PSA-157–58. He described that "in severe cases of gender dysphoria—and in the absence of adequate medical, surgical, and mental health care—self-harm, self-mutilation, suicidal ideation, and suicide are well established negative health outcomes of this disease." PSA-128. Dr. Berli found that Ms. Doe's "medical history very clearly documents the direct link from [her] self-mutilation and suicidality to her gender incongruence and lack of access to appropriate medical care." *Id.* He stated the "broader medical and scientific community recognizes WPATH as establishing the authoritative standards for treatment of transgender people with gender dysphoria." PSA-129. He concluded that gender-affirming surgery is necessary for Ms. Doe. PSA-142, 145.

Dr. Lowell and Dr. Berli also wrote rebuttal opinions to Defendants' experts Dr. Kristopher Kaliebe's and Dr. Stephen Levine's reports. *See* PSA-239, 251. Dr. Lowell emphasized that, from her "read of Ms. Doe's medical history, GDC's mental health providers, including Dr. Howard and Dr. Frady, found that Ms. Doe's mental health comorbidities did not affect her competence to consent to gender-affirming care." PSA-258–59. She found common ground between her and Dr. Levine's report that recommends "'social treatments' . . . as a condition that prevents suicide," noting that this would support Ms. Doe's claims for social-transitioning items, not cut against them. PSA-259. Dr. Levine pointed out that the WPATH Standards of Care are the

primary source used by the American Psychiatric Association and are the "globally accepted standards of medicine, agreed upon by all major United States medical organizations," a critical conclusion with which Dr. Lowell also agreed. PSA-270, 272–73. Dr. Lowell found "Dr. Kaliebe's opinions to be speculative, baseless, unprofessional, and irrelevant to Ms. Doe's care." PSA-272. And Dr. Lowell pointed out that neither Dr. Levine nor Dr. Kaliebe had actually evaluated Ms. Doe. PSA-270, 274.

Plaintiff submitted motions to exclude the testimony of Drs. Levine and Kaliebe. *See* PSA-288, 316. The district court denied the motions without prejudice, finding that they were untimely filed. *See* AA Vol. 6 (SEALED), 2/12 Tr. at 163–65. The district court stated, however, that it would "consider [the motions to exclude] if there are things in there that [Plaintiff] think[s] [the experts have] done wrong or in the past that challenge [their] credibility." *Id.* at 164. This Court can therefore do the same.

B.    Preliminary Injunction Hearing

The district court held an expedited hearing, Dkt. 31-3 at 17, at which Ms. Doe, Dr. Lowell, and Dr. Haw presented live testimony. *See* AA Vol. 6 (SEALED), 2/12 Tr. at 16, 72, 123. Defendants also presented testimony from one of their experts, Dr. Kaliebe. *Id.* at 167. After Plaintiff testified, the district court found her "credible." *Id.* at 225. The district court found "Plaintiff's experts 'very credible,' particularly their opinions that to monitor properly the efficacy of Plaintiff's HRT, her treating physician

must conduct both lab testing and a physical examination." Dkt. 31-3 at 25.

In turn, the district court stated that it had "doubts regarding [Dr. Levine's] qualifications to testify about issues of prison security." *Id.* at 30. On the second day of the hearing, the district court said: "I'm not sure that I put much credence to the fact" that Dr. Kaliebe found gender-affirming surgery was not medically necessary. AA Vol. 6 (SEALED), 2/13 Tr. at 285. But the district court found that Dr. Kaliebe "said in the end, on a case-by-case basis, both hormones and surgery might be medically necessary." *Id.* The district court stated that because Dr. Kaliebe "hasn't done any specific visit with this specific plaintiff, I'm not sure that he can really be used to counter Haw and Lowell as to at least what they say is medically necessary." *Id.* at 286.

## C.    Findings of Fact and Conclusions of Law

The district court issued a written order granting the preliminary injunction in part. Dkt. 31-3 at 14. Although the district court did not entitle a section of its order "Findings of Fact" or "Conclusions of Law," it made numerous findings of fact and conclusions of law throughout its order. Plaintiff submits the following statements as findings of fact to which this Court should defer, reviewing only for clear error:

- "Given Plaintiff's prior attempts at self-castration and suicide, Defendants clearly know the risk of harm Plaintiff faces from untreated gender dysphoria." *Id.* at 21.

- "Defendants do not dispute that HRT is medically necessary to treat Plaintiff's gender dysphoria." *Id.* at 23.

- "Defendants . . . admitted their obligation to provide 'adequate feminizing hormone therapy.'" *Id.* (quoting AA Vol. 7 (SEALED), 2/13 Tr. at 316, 318).

- "Defendants concede HRT resulting in feminizing changes to Plaintiff's body is medically necessary for treatment of her gender dysphoria." *Id.* at 23–24.

- The district court cited its finding at the hearing that Plaintiff's experts are "very credible." *Id.* at 25.

- The district court also "finds credible Plaintiff's testimony that she feels her current dosage is inadequate because she is not experiencing hair loss and other feminization like she experienced before 2019." *Id.*

- Dr. Mulloy's declaration does not support that he will use physical examinations to adjust Plaintiff's hormone treatment. *Id.* at 25–26. Thus, "the evidence suggests Dr. Mulloy is not properly examining whether Plaintiff's current HRT regimen is providing the changes to her body that Defendants agree are medically necessary—something common sense (and Plaintiff's experts) suggest he should be doing." *Id.* at 26–27. The district court "accepts Plaintiff's experts' opinions that [the consideration of physical changes] should be part of the medical protocol to ensure the desired physical changes." *Id.* at 28 n.6.

- "The evidence before the Court establishes that Plaintiff has not experienced the intended changes to her body so as to relieve her distress." *Id.* at 26. But the district court found "she has not been on her current dosage long enough to determine whether it is sufficient." *Id.*

- The district court found that Dr. Lowell "was a credible witness" and that her testimony—that "gender-affirming cosmetic[7] items are medically necessary because '[t]hey decrease that extreme distress that's associated with gender dysphoria,'" and that "while Defendants attempt to get Plaintiff to the right level of HRT, they should provide these items in the meantime to alleviate Plaintiff's symptoms"—"makes sense." Dkt. 31-1 at 29. Thus, the district court agreed with Dr. Lowell that gender-affirming padding and hair removal cream are medically necessary. *Id.* at 32.

- The district court "accept[ed] Defendants' judgment that wigs and makeup might make Plaintiff more of a target, and thus also accept[ed] their judgment that this rational security concern warrants against requiring Defendants to provide Plaintiff those items." *Id.* at 30.

---

[7] Although the district court used this term, "gender affirming . . . items and permanent hair removal are not merely cosmetic treatments but, instead, medically necessary treatments to address the serious medical condition of gender dysphoria." *Hicklin v. Precynthe*, No. 4:16-CV-01357-NCC, 2018 WL 806764 at *12 (E.D. Mo. Feb. 9, 2018).

- The district court found, however, that "Defendants didn't really raise a security concern over padding." *Id.* The district court found that "Warden Jones," Plaintiff's former Warden, "knew about [Plaintiff's use of makeshift breast padding] and permitted her to do so." *Id.* at 31 n.8. The district court found that "[t]his shows he did not find the padding a security threat." *Id.*

- "Defendants [did not] offer any explanation for how hair removal might cause any security concerns." *Id.* at 31. The district court found the security concern Defendants provided at the hearing—that hair removal cream "could potentially be used against another prisoner" because "[i]t's a chemical," *see* AA Vol. 7 (SEALED), Tr. 2/13 at 329–30—was "mere conjecture." Dkt. 31-3 at 31. Thus, the district court found that "Defendants have failed to articulate any precise security concern related to padding or hair removal cream." *Id.*

- "Plaintiff has shown that—absent the Court's intervention—she is at risk of irreparable harm, namely severe self-harm." *Id.* at 55. "Her pain was clear from her testimony." *Id.*

Based on these findings of fact, the district court "conclude[d] Plaintiff is likely to succeed on her claim that *some* of the medical care Defendants have provided so far is inadequate to treat her gender dysphoria and that they have acted with deliberate indifference in refusing to provide *some* of the care she seeks—specifically as to the

provision of certain commissary items." Dkt. 31-3 at 21–22.[8] The district court reasoned that if "all the parties agree that Plaintiff needs bodily feminization to ease her dysphoria symptoms—and that the right level of HRT will ultimately provide that relief—it seems they should also agree that she should receive cosmetic items that can provide some level of that relief in the interim." Dkt. 31-3 at 29.

The district court reiterated this reasoning in response to Defendants' argument that "the commissary items might be psychologically 'pleasing' to Plaintiff, [but] because there is no medical consensus that such items are medically necessary, Defendants are not required to provide them." *Id.* at 32. As the district court said, "Defendants miss the point." *Id.* The district court found that "to the extent Defendants argue these cosmetic items are not medically necessary in the interim," while waiting for the "intended" effects of HRT "to provide feminization," "their argument . . . rings hollow." *Id.* at 33 n.9.

The district court thus concluded that Ms. Doe is "likely to succeed on her claim that Defendants are denying her necessary medical care in refusing to provide these items," referring to buttock and breast padding and hair removal cream. *Id.* at 33. Walking through the reasoning once again, the district court

---

[8] The district court concluded that Plaintiff met this Court's higher standard of deliberate indifference. *See* Dkt. 31-3 at 20–21 & n.4 (holding Plaintiff meets the higher standard articulated in *Hoffer v. Secretary, Florida Department of Corrections*, 973 F.3d 1263, 1270 (11th Cir. 2020), such that she necessarily meets the less stringent standard in *Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020)).

emphasize[d] that it reache[d] this narrow decision because: (1) the parties agree HRT is medically necessary to provide feminizing changes to Plaintiff's body; (2) Dr. Lowell testified that feminizing cosmetic items can significantly relieve Plaintiff's distress while her HRT takes effect; (3) Plaintiff explained she obtained significant relief from prior HRT that caused more feminine bodily proportions and less body hair; and (4) Defendants do not identify any security risk posed by these two items.

*Id.* at 33–34.

Moreover, the district court responded to Defendants' argument that "any order requiring feminizing cosmetic products would violate the need-narrow-intrusiveness requirement of the [Prison Litigation Reform Act ("PLRA")]." *Id.* at 34 n.10. The district court held that "[t]he relief [it] orders . . . respects GDC's judgment on security concerns and is narrowly tailored to provide Plaintiff with something Defendants *agree* is medically necessary to treat her gender dysphoria—that is, feminization of her body using cosmetic items while the HRT that Defendants also *agree* is medically necessary takes effect." *Id.* The court thus held that its "injunctive relief is well within the PLRA's bounds." *Id.*

The district court "conclude[d] that should [Plaintiff] not receive medically necessary treatment (including adequate HRT and—in the meantime—gender-affirming cosmetic items), the distress caused by Plaintiff's dysphoria could result in a risk of irreparable harm." *Id.* at 55.

In response to Defendants' argument that Plaintiff's delay in seeking

preliminary-injunctive relief was fatal to her motion, the district court found that Plaintiff "previously sued GDC officials because they refused to restart her HRT or evaluate her for gender-affirming surgery" and "dismissed that case after one of her new doctors at Phillips recommended she be evaluated. . . . When that did not happen, she brought this suit." *Id.* at 56. The district court concluded that "[f]ar from showing delay, Plaintiff's history of litigation demonstrates her desire for medical assistance to cure her distress that poses a serious risk of physical and psychological harm." *Id.*; *see also id.* at 57 ("Plaintiff's purported delay does not overcome clear evidence of risk of irreparable harm.").

Finally, Defendants raise in their opening brief the fact that Plaintiff entered into a settlement agreement with Georgia in 2018 that released her future claims for gender-affirming care. Appellant's Opening Brief ("AOB") at 19.[9] Defendants did not mention that the district court held that this settlement is unconscionable. *See* Dkt. 31-3 at 19 n.3. Defendants forfeited an appeal of this holding. The district court was clear as to the effect on the delay question: "Plaintiff's prior settlement is . . . not dispositive." *Id.* at 50. The district court held that "Plaintiff's self-castration attempt and suicidal ideation *after* she signed the settlement agreement shows her gender dysphoria clearly

---

[9] Plaintiff described the alarming circumstances of signing the release and settlement agreement in an affidavit and at the hearing. *See* PSA-233–36; AA Vol. 6 (SEALED), 2/12 Tr. at 45–50.The district court found her credible, AA Vol. 6 (SEALED), 2/12 Tr. at 225, and discussed her experience in its order, *see* Dkt. 31-3 at 19 n.3, 50.

continued (and continues) to put her at risk of serious harm." *Id.* at 57.

In balancing the equities and evaluating the public interest, the district court "conclude[d] Defendants would suffer no harm from being ordered to comply with their constitutional obligations as set forth above—that is in providing padding and hair removal cream." *Id.* The district court held that Defendants did not establish that the "costs of compliance—financial or logistical—are 'so significant as to outweigh the important constitutional rights at issue.'" *Id.* at 58 (citation omitted). The district court thus concluded that "both these factors weigh in favor of injunctive relief, and Plaintiff has met her burden at this stage to show she is now entitled to at least some of the relief she seeks as this litigation runs its course." *Id.*

## IV. <u>Current Stage of Proceedings</u>

Defendants timely appealed. Dkt. 31-3 at 61. Plaintiff filed a motion to dismiss the appeal for lack of jurisdiction as to Defendants' request to overturn the district court's order granting leave for Plaintiff to proceed under a pseudonym. *See generally* Dkt. 25. As part of their response to that motion, Defendants petitioned for a writ of mandamus to compel the district court to unseal the record and thus reveal Plaintiff's name in the public record. *See* Dkt. 29 at 13–15. Defendants also cross-moved to unseal the record on appeal. *See id.* at 11–13.

## <u>SUMMARY OF THE ARGUMENT</u>

I.    This Court should dismiss Defendants' untimely appeal of the district

court's order granting Plaintiff leave to proceed using a pseudonym. Plaintiff argued in a motion to this Court that Defendants lack any basis to appeal this issue under the collateral order doctrine or pendent jurisdiction. In response, Defendants explicitly waived any arguments under those theories. *See* Dkt. 29 at 8, 10–11. Instead, they push forth the sole claim that the scope of the appeal of the preliminary injunction includes this additional order. But the pseudonymity issue is not at all relevant to the preliminary injunction and thus is not justifiably within the scope of appeal. Thus, this Court should dismiss this issue for lack of jurisdiction.

II.     A district court order granting leave to proceed under a pseudonym does not warrant the extraordinary remedy of mandamus. In fact, case law from this Court, which Defendants cited in their brief, quite clearly holds the opposite: that a district court's order *denying* the restriction of highly sensitive information as "Attorneys' Eyes Only" created such a harmful outcome that this Court granted the extraordinary remedy of mandamus to order the district court to enter an order granting a protective order. *In re Sec'y, Fla. Dep't of Corr.*, No. 20-10650-J, 2020 WL 1933170, at *3 (11th Cir. Mar. 30, 2020). This Court has held that the privacy interests pertaining to gender identity and mental illness overcome the public's interest in information. *Doe v. Neverson*, 820 F. App'x 984, 988 (11th Cir. 2020). Thus, the Court should deny the writ (or deny the appeal of this issue on the merits, if it finds it has jurisdiction).

III.     The district court did not err in holding that Plaintiff met her burden for a

preliminary injunction order. Defendants' arguments regarding the PLRA and this Court's precedent in *Keohane v. Florida Department of Corrections Secretary*, 952 F.3d 1257 (11th Cir. 2020), do not bar relief. Critically, there is no legitimate dispute of medical opinion here because neither of GDC's medical experts met Plaintiff to evaluate her, and her very own treating physicians in GDC—mental health professionals, Dr. Howard and Dr. Frady—did not dispute that gender-affirming items would benefit her. This distinguishes the case from *Keohane*.

The differences do not stop there. The security risks that Defendants argue should foreclose the district court's injunctive order for hair removal cream and breast and buttock padding are not "legitimate" or "rational[]." *Keohane*, 952 F.3d at 1276, 1277; *see also* Dkt. 31-3 at 31 (finding Defendants' security concerns to be "mere conjecture" and entirely lacking). Notably, Plaintiff was formerly permitted to use makeshift bra padding, to her Warden's knowledge.

The injunctive relief granted meets the need-narrowness-intrusiveness requirement—which has never been Plaintiff's burden to establish until Defendants raise this defense upon the entry of injunctive relief. The district court denied most of Plaintiff's requests due to either GDC's security concerns or mootness and ripeness issues. It granted only two specific items (i.e., hair removal cream and padding) that would realize the intended effects of hormone therapy, which GDC has conceded is medically necessary care for Ms. Doe: feminization of the body through physical

changes to hair and soft tissue growth. Ms. Doe experienced these changes previously when she was on a higher dose of estradiol and suffered immensely when her body reverted to a more masculine form after her medical providers in GDC discontinued her HRT for four years. Even though she has been back on feminizing hormones to some degree (for about 8 months from the time of filing the complaint), she has yet to experience these feminizing effects. Indeed, her treating physician, Defendant Mulloy, says she will not experience any feminizing effects until she is at a higher dose, which he refuses to prescribe her. Dkt. 31-2 at 162 ¶ 16. Although the district court found it premature to order Defendants to increase her dose, it found that because the treatment was not having the intended effect, it was inadequate. Thus, the district court ordered gender-affirming items that would provide a feminized physical expression until HRT's effects occurred. The district court spelled this reasoning out numerous times; it did not use boilerplate language to meet the PLRA's requirement.

## STANDARD OF REVIEW

### I.     Order Granting Leave to Proceed Using a Pseudonym

This Court reviews *de novo* whether it has jurisdiction to consider an interlocutory appeal. *United States v. Shalhoub*, 855 F.3d 1255, 1259 (11th Cir. 2017). Assuming this Court has jurisdiction to review the relevant order, which Plaintiff argues it does not, this Court reviews a district court's order allowing the use of a pseudonym for abuse of discretion. *See In re Chiquita Brands Int'l*, 965 F.3d 1238,

1246 (11th Cir. 2020). "This is an 'extremely limited and highly deferential' standard of review.'" *Id.* (quoting *In re Clerici*, 481 F.3d 1324, 1331 (11th Cir. 2007)).

## II.    <u>Writ of Mandamus</u>

"[T]he remedy of mandamus is a drastic one, to be invoked only in extraordinary situations." *Allied Chem. Corp. v. Daiflon, Inc.*, 449 U.S. 33, 34 (1980). "Because a writ of mandamus is an action against the district court judge, the remedy is a drastic one that only exceptional circumstances, amounting to a judicial usurpation of power, will justify." *Shalhoub*, 855 F.3d at 1259 (quoting *In re Coffman*, 766 F.3d 1246, 1248 (11th Cir. 2014)). This Court "will issue a writ only if a petitioner establishes that he has no other adequate means to attain the relief he desires and that his right to the issuance of the writ is clear and indisputable." *Id.* (citation omitted). This Court "must be satisfied that the writ is appropriate under the circumstances." *Id.* (citation omitted); *see also Cheney v. U.S. Dist. Court*, 542 U.S. 357, 380–81 (2004).

## III.    <u>Preliminary Injunction</u>

This Court "examine[s] the district court's decision to deny a preliminary injunction for abuse of discretion, reviewing *de novo* any underlying legal conclusions and for clear error any findings of fact." *State of Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1279 (11th Cir. 2021). "A district court abuses its discretion if it applies an incorrect legal standard, applies the law in an unreasonable or incorrect manner, follows improper procedures in making a determination, or makes findings of

fact that are clearly erroneous." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270 (11th Cir. 2020) (citation omitted).

This Court's review "must be highly deferential," *Siegel v. LePore*, 234 F.3d 1163, 1178 (11th Cir. 2000), and "extremely narrow in scope," *Carillon Imps., Ltd. v. Frank Pesce Int'l Grp. Ltd.*, 112 F.3d 1125, 1126 (11th Cir. 1997). This "limited review is necessitated because the grant . . . of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury . . . . Weighing these considerations is the responsibility of the district court." *Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers*, 740 F.2d 892, 893 (11th Cir. 1984) (citation omitted). "No attention is paid to the merits of the controversy beyond that necessary to determine the presence or absence of an abuse of discretion." *Cafe 207*, 989 F.2d at 1137 (cleaned up).

## ARGUMENT

The district court's order was measured, narrow, and precise in its reasoning. Its findings of fact were not clearly erroneous, and it applied the law correctly and reasonably. Defendants ignore the standard of review in hopes that this Court will overturn the important findings of fact that the district court made. In doing so, Defendants completely omit crucial information in their opening brief. Plaintiff

identifies four deficiencies with the opening brief and Defendants' position at the outset before moving to her main arguments:

First, despite having unfettered access to Plaintiff, given that she is in Defendants' custody, neither of Defendants' expert witnesses actually met with her. So their reports, particularly as to her individualized medical needs, are merely speculative. *See* PSA-209–09 (Plaintiff's arguments to this effect in her reply brief in support of the preliminary injunction); PSA-239–87 (Plaintiff's experts rebutting Defendants' experts' reports and making this point); PSA-288–339 (Plaintiff's motions to exclude their testimony). Defendants bury this fact.

Relatedly, there is no genuine dispute of reasonable medical opinions in this case. Two psychiatrists employed by or through GDC evaluated Plaintiff in 2022 and found that her psychiatric issues did not affect her competence in seeking gender-affirming care. PSA-209; *see* PSA-344 (SEALED) ("I do believe she has capacity regarding the pursuit of gender affirming treatment."). No GDC medical official has denied the medical necessity of her gender-affirming items. PSA-350 (including in her "PLAN" a referral for "[f]urther medical assessment," as well as "[c]ollaboration with GDC for issues associated with housing, security, medical and behavioral intervention, and gender affirmative items and practices"); PSA-351 (deferring to medical for further treatment of Plaintiff's mental health needs after her suicide attempt in 2017, triggered in part by her gender dysphoria); PSA-352 (describing Plaintiff's self-

castration attempt came after "becoming more depressed day by day" following the discontinuation of estradiol). And GDC has recognized the WPATH Standards of Care as the "basic standard of care." *Lynch v. Ward*, No. 5:21-CV-461, 2022 WL 2392868, at *1 (M.D. Ga. July 1, 2022). GDC simply deprived Plaintiff of necessary care.

Third, the Warden of Phillips State Prison, where Plaintiff is currently housed, during the relevant time period knew that she was wearing homemade breast padding and did not seize the padding from her. *See* Dkt. 31-3 at 31 & n.8. This practice is at odds with any security risk argument Defendants now raise in litigation.

Finally, as the district court emphasized, its decision was very narrow. The district court granted only those gender-affirming items that would serve the purpose of allowing Ms. Doe's body to look feminized in the way it did in the years before her estradiol was discontinued. And, as the district court stated at least three times, GDC has conceded that the goal of HRT is to allow these feminizing effects to occur.

## I. <u>This Court should not disturb the pseudonym order.</u>

### A. <u>This Court lacks jurisdiction to review the pseudonym order.</u>

As argued in the motion pending before this Court, *see* Dkt. 25, Defendants raise an untimely appeal to the district court's order granting Plaintiff leave to proceed under a pseudonym.[10] Defendants have explicitly waived any arguments under the collateral

---

[10] That the appeal of the order is untimely is sufficient grounds for this Court to deny Defendants' appeal of this issue, even if the collateral order doctrine could apply.

order doctrine and pendent jurisdiction. *See* Dkt. 29 at 8, 10–11. All that is left is their strained argument that the scope of the appeal of the district court's preliminary injunction order extends to the *merits* of the entirely separate order regarding pseudonymity. This argument falls flat.

The district court's order granting leave to proceed under a pseudonym is neither "closely related to" nor "inextricably bound up" with the preliminary order. *See Callaway v. Block*, 763 F.2d 1283, 1287 n.6 (11th Cir. 1985); *Transcon. Gas Pipe Line Co. v. 6.04 Acres, More or Less, Over Parcel(s) of Land of Approximately 1.21 Acres, More or Less, Situated in Land Lot 1049*, 910 F.3d 1130, 1171 n.24 (11th Cir. 2018); *Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250 (11th Cir. 2005). There are no facts in the pseudonym order that the "issuance of the injunction was conditioned on." *Transcon. Gas Pipe Line Co.*, 910 F.3d at 1171 n.24. At no point in the preliminary injunction order does the district court even call Plaintiff by her pseudonym. The pseudonym order does not bear on the merits at all. *Cf. Solantic*, 410 F.3d at 1272–74. The orders are simply unrelated.

Judicial efficiency is similarly not impacted here because the merits are not tied up in the pseudonym order whatsoever. *See Callaway*, 763 F.2d at 1287 n.6; *Solantic*,

---

Because nothing in the preliminary injunction affected the district court's ruling on using a pseudonym, the thirty-day window for an appeal of a district court's order (which, here, expired on February 12, 2024) bars review. *See* Fed. R. App. P. 4(a)(1)(A); *S.B. v. Fla. Agric. & Mech. Univ. Bd. of Trustees*, 823 F. App'x 862, 865–66 (11th Cir. 2020).

410 F.3d at 1273–74. Defendants raise frivolous arguments regarding the "significant effort and cost" of "preserving anonymity." Dkt. 29 at 7. But these costs, which Defendants cannot even quantify,[11] do not outweigh the district court's reasoned decision, relying on this Court's precedent, that found Plaintiff's concerns for the privacy of her transgender identity and private medical information in this case merited proceeding under a pseudonym. Dkt. 31-1 at 51–52. And "the assurance of fairness preserved by public presence at trial is not lost when one party's cause is pursued under a fictitious name." *Doe v. Stegall*, 653 F.2d 180, 185 (5th Cir. Unit A 1981).

This Court should dismiss Defendants' request to overturn the district court's order for lack of jurisdiction.

B. Mandamus is not warranted to overturn the pseudonym order.[12]

For Defendants to be issued a writ of mandamus on appeal, they (1) "must have no other adequate means to attain the relief"; (2) "must satisfy the burden of showing that [their] right to issuance of the writ is clear and indisputable"; and (3) the issuing court, in the exercise of its discretion, must be satisfied that the writ is appropriate

_____

[11] The "effort and cost" of proceeding in this appeal are fictive. Under the local rules, Defendants would need to submit paper copies of the appendix even if certain portions were not sealed. So the only additional "effort" would be the time required to place sealed documents in a different volume of the Appendix.

[12] Defendants raised the alternative argument that this Court should "construe Defendants' appeal as a petition for a writ of mandamus." Dkt. 29 at 13. If the Court disagrees with Plaintiff and decides that it has jurisdiction to reach the pseudonym order on appeal, Plaintiff submits the relevant arguments in this section as her arguments on the merits of the review of the district court's order.

under the circumstances." *Cheney*, 542 U.S. at 380–81 (cleaned up).

There are certainly other ways for Defendants to attain the relief they request. As they have done in this Court, Defendants can file a motion to unseal the record. Dkt. 29 at 11–13. That filing should be dispositive; this Court should deny the petition for a writ on the availability of this alternate means to the remedy alone. This Court should make its decision on this issue on the motions currently pending before this Court rather than through a writ of mandamus.

Defendants' right to the writ is up for debate, at best. Defendants therefore cannot prove that their right is "indisputable." *Cheney*, 542 U.S. at 381. The underlying question is the standard for reviewing motions to proceed anonymously: "whether Plaintiff has a substantial privacy right that outweighs the customary and constitutionally-embedded presumption of openness in judicial proceedings." Dkt. 31-1 at 50 (cleaned up) (quoting *S.B. v. Fla. Agric. & Mech. Univ. Bd. of Trustees*, 823 F. App'x 862, 866 (11th Cir. 2020)). Three factors guide the inquiry: "whether Plaintiff is challenging government action, whether Plaintiff will have to disclose exceedingly intimate or private information, and whether Plaintiff will have to admit her plan to break the law." *Id.*

The district court's decision weighed the very same considerations that Defendants present to this Court. *See id.* at 50–53. The district court "readily conclude[d] disclosure of Plaintiff's identity will require disclosure of highly private

information." *Id.* at 51. This Court has held that "mental illness, homosexuality, and transsexuality" carry a "social stigma" that justifies "permit[ing] plaintiffs to proceed anonymously." *Neverson*, 820 F. App'x at 988 (quoting *Doe v. Frank*, 951 F.2d 320, 324 (11th Cir. 1992)). The district court was unconvinced by Defendants' argument that her previous litigation identified her publicly. *See* Dkt. 31-1 at 51. The district court rightly noted that this case presents "other events that have taken place in a new facility well after those addressed in her prior cases." *Id.* Further, the district court found that "disclosure of her identity here will necessarily result in additional disclosure (or republication) of her transgender status, mental health problems, and other private medical information." *Id.* at 51–52. The district court's order shows reasonable disagreement with Defendants' argument that public access should outweigh Plaintiff's particular privacy interests. Even if this Court would find differently, the district court's reasoning is not so far beyond the realm of possibility to be considered an abuse of discretion. *See In re Chiquita Brands Int'l*, 965 F.3d at 1246.

Plaintiff also urges this Court to take into account the reality of the present day situation for transgender people as part of its "careful[] review [of] all the circumstances." *Id.* at 1247 (citation omitted). The release of this information puts Ms. Doe at higher risk of serious bodily harm or death. *Cf. Kallstrom v. City of Columbus*, 136 F.3d 1055, 1064 (6th Cir. 1998). She may be at heightened risk of physical attack

or retaliation because of the stigma towards transgender people. *See* Sandy E. James *et al.*, National Center for Transgender Equality, *The Report of the 2015 U.S. Transgender Survey* 198 (2016) (finding in a survey of 27,715 transgender people across the United States—the most comprehensive study ever conducted—that in 2014, 9% of respondents reported being physically attacked and 46% reported being verbally harassed because they are transgender). Incarcerated transgender people are five times more likely to be sexually assaulted by prison staff and nine times more likely to be sexually assaulted by other incarcerated people than the general prison population. *Id.* at 15. Of course, Ms. Doe has already been subjected to such violence, including rape by a state correctional officer, so she has even more of a reasonable fear of it reoccurring—especially when people continually proposition her in her cell at Phillips State Prison. PSA-46, 76–77, 80. For all these reasons, Defendants cannot meet the requirement that their right to the writ is indisputable.

The writ is inappropriate under the circumstances. All parties in the case know Plaintiff's identity, so the information being withheld is not unknown to the parties themselves. *Cf. Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 608 (1978) (describing such a case and nevertheless holding that the "common-law right of access to judicial records does not authorize the release of the [Watergate] tapes"). No one in the public has petitioned to unseal the case or reveal her name for a legitimate reason. *Cf. Chi. Tribune Co. v. Bridgestone/Firestone*, 263 F.3d 1304, 1308–15 (11th Cir. 2001)

(describing case of intervenors seeking to unseal the record); *In re Alexander Grant & Co. Litig.*, 820 F.2d 352, 354–57 (11th Cir. 1987) (same); *Brown v. Maxwell*, 929 F.3d 41, 44–45 (2d Cir. 2019); *Metlife, Inc. v. Fin. Stability Oversight Council*, 865 F.3d 661, 663 (D.C. Cir. 2017) (same). The potential for further harassment and violence against Plaintiff should weigh in favor of finding against the Defendants' request.

Notably, a case cited by Defendants actually helps Plaintiff's position. In the case, a district court had *denied* an order seeking "Attorneys' Eyes Only" status on sensitive prison information, and this Court granted a writ of mandamus to protect the petitioners' privacy. *See In re Sec'y, Fla. Dep't of Corr.*, No. 20-10650, 2020 WL 1933170, at *1. Cherry-picking at the general subject matter, Defendants argued in their motion to unseal the record that because Ms. Doe's case is also in the "highly sensitive" area of "prison security and safety," granting the writ is appropriate. *See* Dkt. 29 at 23 (quoting *In re Sec'y, Fla. Dep't of Corr.*, No. 20-10650, 2020 WL 1933170, at *3). This is the exact opposite conclusion this Court would reasonably reach if applying the reasoning of that decision. Unlike in the case cited, the district court here *protected* Plaintiff's privacy; granting the writ would risk disclosure of highly sensitive information, not the other way around.

II.   **This Court should affirm the preliminary injunction order.**

      A.   Plaintiff met her burden for a preliminary injunction.

The district court properly entered a preliminary injunction after finding that (1)

Plaintiff has a substantial likelihood of success on the merits of her medical deliberate indifference claim as related to hair removal cream and padding, (2) Plaintiff faces imminent or ongoing irreparable harm without these items, (3) the severe harm facing Plaintiff outweighs the harm to Defendants because Defendants will not be harmed by providing these items, and (4) the public interest favors this relief. *See* Dkt. 31-3 at 33–34, 56–58; *see also Swain v. Junior*, 961 F.3d 1276, 1284–85 (11th Cir. 2020).

In order to state a claim that a prison official has acted with deliberate indifference to serious medical needs, a plaintiff must allege: (1) "an objectively serious need," (2) "an objectively insufficient response to that need," (3) "subjective awareness of facts signaling the need," and (4) "an actual inference of required action from those facts." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). "Because the Eighth Amendment 'draws its meaning from the evolving standards of decency that mark the progress of a maturing society,' the objective harm inquiry is contextual in that it is responsive to contemporary standards." *Thomas v. Bryant*, 614 F.3d 1288, 1304 (11th Cir. 2010) (quoting *Hudson v. McMillian*, 503 U.S. 1, 8 (1992)).

The district court did not err in concluding that Ms. Doe established all the elements for medical deliberate indifference as to the two gender-affirming items awarded—padding and hair removal cream. The district court's reasoning shows why these items are proper, narrowly tailored measures to protect Ms. Doe's rights as she waits for the intended effects of her hormone therapy to manifest. *See* Dkt. 31-3 at 28–

34

29. First, Defendants have not disputed that Ms. Doe's gender dysphoria is a serious medical need. *Id.* at 20. Second, the district court correctly found that "Defendants clearly know the risk of harm Plaintiff faces from untreated gender dysphoria" based on her "prior attempts at self-castration and suicide." *Id.* at 21. Moreover, Ms. Doe's gender dysphoria is lightened when she is able to wear padding. *See* PSA-225. Removing the padding now that she has been able to wear it will have extremely deleterious consequences to her mental health. *Id.* So there would have been considerable harm if the district court denied the injunctive relief, and now there will be a unique type of harm if this Court reverses it.

Defendants raise no legitimate argument about their awareness of Ms. Doe's needs. They argue that the district court erred by analyzing Defendants collectively rather than individually. AOB 31–32. They did not raise this argument below and therefore have forfeited it. *See Merilien v. Warden*, No. 21-12415, 2023 WL 5846294, at *1 (11th Cir. Sept. 11, 2023); *Walker v. Jones*, 10 F.3d 1569, 1572 (11th Cir. 1994). In any event, the case law they rely on is from the qualified immunity context, where the importance of that inquiry would make sense for allocating damages. *See Jackson v. West*, 787 F.3d 1345, 1353 (11th Cir. 2015); *Burnette v. Taylor*, 533 F.3d 1325, 1331 (11th Cir. 2018). Here, Plaintiff brought her motion for preliminary injunction against the official capacity defendants who she alleged to have responsibility over her care and housing decisions or policies. Her complaint specifies those responsibilities, as

well as the subjective awareness of each individual officer named in their official capacity under the causes of action. *See* Dkt. 31-2 at 130–36, 177–86. Qualified immunity is not at issue at this stage in the proceedings.

As the district court found, "Defendants do not dispute that HRT is medically necessary to treat Plaintiff's gender dysphoria." Dkt. 31-3 at 23. They argue, rather, that HRT should be Plaintiff's only treatment for gender dysphoria, and that this Court's cases do not allow her to have access to all medically necessary care if she is receiving "minimally adequate care." AOB 17 (quoting *Hoffer v. Sec'y, Fla. Dep't of Corr.*, 973 F.3d 1263, 1277 (11th Cir. 2020)).

Plaintiff's current care does not meet this threshold of "minimally adequate care." That is what her testimony and the expert declarations show. *See* PSA-103 ("Ms. Doe's treatment is inadequate."), 107 ("Ms. Doe's current treatment is severely inadequate, to the point that it puts her health at risk. She is currently prescribed 6mg injections of Estradiol every two weeks, which is a very low dose for injections under this timeframe."), 108–09 ("I strongly suspect her current Spironolactone dose is inadequate. . . . Given this markedly underdosed treatment, it is not surprising that Ms. Doe is not having *any results* from her treatment. She reports no feminizing effects, and her symptoms of Gender Dysphoria are severe. She is currently having thoughts of self-castration." (emphasis added)). And that is the conclusion the district court drew from the evidence presented. Dkt. 31-3 at 21–22 ("The Court concludes Plaintiff

is likely to succeed on her claim that *some* of the medical care Defendants have provided so far is inadequate to treat her gender dysphoria . . . ."). The district court thus had sufficient factual basis to conclude that Defendants "have acted with deliberate indifference in refusing to provide *some* of the care she seeks—specifically as to the provision of certain commissary items." *Id.* at 22.

In sum, Defendants have inadequately responded to Ms. Doe's medical need, falling *below* the "minimally adequate care" threshold, by prescribing her with a low dosage of HRT that has not achieved the feminizing bodily changes that would treat her gender dysphoria and by refusing to provide her items that would treat her gender dysphoria as she awaits her dosage to take effect or to increase.

The district court relied in part on Dr. Lowell's discussion of Ms. Doe's need for these items during this interim period. *Id.* at 29; *see* PSA-112 ("It is also imperative that Ms. Doe have access to . . . butt padding until she achieves feminizing fat redistribution."); *see also* PSA-112 ("To immediately help alleviate Ms. Doe's gender dysphoria, . . . it is medically necessary, imperative, and urgent that GDC provide her with gender-affirming medical treatment, including, but not limited to . . . bra and butt padding [and] access to hair removal products . . . ."), 111 ("To treat Ms. Doe's gender dysphoria, it is imperative and urgent that Ms. Doe have consistent, uninterrupted access to hair removal products, such as shaving products and hair removal cream."). The district court's finding that Dr. Lowell is credible should be given deference by

this Court. *See Gore v. Sec'y for Dep't of Corr.*, 492 F.3d 1273, 1300 (11th Cir. 2007) ("A certain amount of deference is always given to a trial court's credibility determinations."). There is no evidence here that Dr. Lowell's evaluation of Ms. Doe's needs are incorrect, particularly because neither of Defendants' expert witnesses ever actually met Ms. Doe and the district court accordingly doubted Dr. Kaliebe's ability to opine on medical necessity. *See* AA Vol. 6 (SEALED), 2/13 Tr. at 286; *see also United States v. Lundgren*, 729 F. App'x 873, 876 (11th Cir. 2018) ("We afford deference to a district court's credibility determinations, and here, no evidence suggests that the district court erred in concluding that the defense expert's valuation was not worthy of credence.").

### 1.     Keohane *did not ban gender-affirming commissary items.*

Defendants contest that the district court's conclusion violates this Court's decision in *Keohane*. Defendants ask this Court to read *Keohane* as issuing a blanket ban on gender-affirming items or on any gender-affirming care against which departments of correction raise any potential security concern. But that's far from the holding of *Keohane*.

In *Keohane*, this Court emphasized that medical care must be individualized. *See Keohane*, 952 F.3d at 1266–67. The Court stated that failing to provide treatment for gender dysphoria *can* violate the Eighth Amendment. *Id.* at 1272. It nonetheless did not find an Eighth Amendment violation as to some of the items sought by the

plaintiff in that case. *See id.* at 1274–77. Importantly, however, the Court did *not* hold that there is no constitutional right to gender-affirming items or grooming accommodations; rather, it held that the plaintiff failed to demonstrate as a factual matter that her right was violated because medical professionals disagreed over her "proper course of treatment." *See id.* at 1274–76. Defendants expand this case beyond its clear, limited holding.

In *Keohane*, the Court also stated that "responding to an inmate's acknowledged medical need with what amounts to a shoulder-shrugging refusal even to consider whether a particular course of treatment is appropriate is the very definition of 'deliberate indifference'—anti-medicine, if you will." *Id.* at 1266–67. As the Fourth Circuit put it, "*some* treatment" is not "*constitutionally adequate* treatment." *De'lonta v. Johnson*, 708 F.3d 520, 526 (4th Cir. 2013).

The "*Keohane* questions" now before this Court, then, are whether *Ms. Doe's* medical providers had different opinions over her proper course of treatment and whether her specific claims presented serious security concerns. The district court evaluated Plaintiff's medical needs on an individualized basis and had the benefit of three expert witness reports who had done the same. That is precisely what *Keohane* calls for. And after doing so, the district court made the finding of fact that breast and buttock padding and hair removal cream are medically necessary for Ms. Doe. *See* Dkt. 31-3 at 29 (agreeing with Dr. Lowell that these gender-affirming items are necessary

while Plaintiff awaits the intended effects of HRT).

Plaintiff's body experienced feminizing effects when she was on an adequate dosage of HRT from December 2015 to April 2019. These effects were lost when Defendants neglected Plaintiff's needs by discontinuing her HRT in 2019 and waiting for four years to restart it in 2023. PSA-127, 236. And then they refused to allow her access to commissary items that would help her retain a feminized expression while waiting for her restarted HRT to take effect. The gender-affirming items awarded by the district court directly and immediately alleviate Ms. Doe's severe symptoms of self-injurious behavior caused by her gender dysphoria and exacerbated by Defendants' actions. *See* PSA-104 ("Since stopping this particular hormone therapy regimen, Ms. Doe has experienced masculinizing physical changes that have significantly exacerbated her gender dysphoria, which causes her substantial mental harm on a daily basis and puts her at risk of substantial physical harm as well.").

2.      *Defendants presented no rational security risks of the items ordered.*

The district court analyzed the alleged security risks raised by Defendants and held that they did not outweigh providing Ms. Doe this medically necessary care. This Court should affirm the district court's conclusion. As a general matter, "security considerations are usually not present in medical care cases." *Chess v. Dovey*, 790 F.3d 961, 973 (9th Cir. 2015). "[I]n the typical case, the plaintiff challenges prison medical staff's refusal or failure to provide care," which "typically do not relate to security or

discipline." *Id.* In the transgender context, however, prison officials have raised security concerns to deny providing treatment. *See, e.g.*, *Keohane*, 952 F.3d at 1276. Allegations of security risks presented by a transgender individual's pursuit of gender-affirming care or housing are not insurmountable. *See, e.g.*, *Soneeya v. Mici*, --- F. Supp. 3d ----, 2024 WL 550171, at *19–22 (D. Mass. 2024) (balancing security and health concerns and concluding "there are no legitimate security concerns about [this] particular female transgender" woman transferring from a men's prison to a women's prison, and ordering the transfer); *Bayse v. Philbin*, No. CV-122-024, 2024 WL 695414, at *12 (S.D. Ga. Feb. 20, 2024) (noting that "no Defendant has offered evidence of security concerns," the plaintiff "seemingly was allowed to continue social transitioning accommodations" for a period of over a year, "and the record is devoid of evidence concerning inmate violence against her"). GDC policies actually allow transgender offenders to receive hygiene items appropriate to their needs if there are no valid security concerns. *See* GDC SOP 206.04, 220.09.

Defendants rely on their experts to argue that there are security concerns for padding and hair removal cream. *See* AOB 9, 22–24. The district court had "doubts regarding [Dr. Levine's] qualifications to testify about issues of prison security." Dkt. 31-3 at 30. It is the role of prison officials, not medical experts, to provide testimony on the security concerns of any given medical treatments. *See Keohane*, 952 F.3d at 1275–76; *see also Kosilek v. Spencer*, 774 F.3d 63, 69 (1st Cir. 2014) (showing the

prison, not the medical experts, formalized its security concerns into a report for the court); *Edmo v. Corizon, Inc.*, 935 F.3d 757, 786, 794 (9th Cir. 2019) (same).

Defendants point out that Warden Jones discussed padding in his affidavit. *See* AOB 10, 25. But the district court did not ignore Warden Jones's declaration, as Defendants assert. *See id.* The district court found that Warden Jones's affidavit did not state that "providing Plaintiff padding would pose a security concern." Dkt. 31-3 at 30. Warden Jones's testimony on this point reads:

> I also have reviewed grievances from Doe related to her desire to obtain special items not available in commissary such as breast pads, hair removal cream, and a wig. . . . Doe's placement in Administrative Segregation warrants the denial of the request for special items as they can pose security risks that are especially relevant to an offender like Doe with a history of an escape attempt. Based on my experience as Warden of Phillips and my previous experience at other GDC Facilities, I believe that providing items to Doe that make her appear more feminine may have the effect of enticing male offenders in a way that disturbs the orderly operation of the facility and can lead to increased incidents of assault. Overall, it is my judgment that the risk of danger to Doe and/or other offenders outweighs Doe's desire to obtain these items that are not available to anyone else in the facility or GDC custody.[13]

Dkt. 31-1 at 128. First, Warden Jones did not discuss buttock padding at all as

---

[13] On this very last point, Warden Jones is incorrect, as are Defendants in their brief. *See* AOB 27 (stating "many of the products Plaintiff seeks are unavailable to *anyone* in GDC custody, including women," but providing no details or evidence). GDC allows people to have wigs for medical reasons. *See* GDC SOP 228.02(IV)(H); PSA-215 & n.5.

part of his testimony here. But Warden Jones definitely listed "breast pads" in the list of items that pose a risk in the facility. It is unclear, however, which of those risks the padding and hair removal cream would actually pose. It is unclear how hair removal cream would assist with an "escape attempt." Similarly, because everyone knows what Ms. Doe looks like, breast padding is unlikely to change her features sufficiently to hide her identity. In any event, Warden Jones did not say more, nor did Defendants put forth any specific arguments about this before the district court.

At most, the district court's statement that Warden Jones did not discuss the security risk of breast padding is harmless error. *See* Fed. R. Civ. P. 61; 28 U.S.C. § 2111; *Kotteakos v. United States*, 328 U.S. 750, 757 (1946); *United States v. Frazier*, 387 F.3d 1244, 1266 n.20 (11th Cir. 2004) (en banc). The district court found "Warden Jones has previously allowed [Plaintiff] to wear padding she made herself" and "Defendants [did not] offer any explanation for how hair removal cream might cause any security concerns." Dkt. 31-3 at 31. The district court assessed the factual dispute over whether Warden Jones gave Plaintiff permission to make her own padding and wear it. *Id.* at 31 n.8. And the district court found that "regardless of whether Warden Jones gave plaintiff the affirmative go-ahead to make and use her own padding, he certainly knew about it and permitted her to do so," which "shows he did not find the padding a

security threat." *Id.*

As the district court concluded, Defendant's alleged security risks as to hair removal cream and padding are not rational or legitimate. Warden Jones's prior permission of Ms. Doe's use of makeshift padding cast a dubious light on his statements in his affidavit regarding the padding. The district court did not go so far as to find that the affidavit was pretextual. *Cf. Keohane*, 952 F.3d at 1276. But the district court was not convinced that Warden Jones could legitimately find breast padding a security risk and yet have allowed Ms. Doe to wear it. Similarly, as the district court found, the security risk posed by hair removal cream was "conjecture." Dkt. 31-3 at 31. This Court should defer to this finding of fact. And it is relevant that "these justifications were only provided post-lawsuit." *Johnson v. Lewis*, 83 F.4th 1319, 1328 (11th Cir. 2023).

Finally, the district court's reasoning as to the security risk also relies on the fact that the intended effect of HRT, which Defendants currently use to treat Ms. Doe, is to feminize Ms. Doe's body. Specifically, the intended effects of HRT include causing her breasts to grow, causing her buttocks to grow, and slowing or stopping her facial and body hair growth. *See, e.g.*, PSA-111 ("*Until Ms. Doe develops additional breast tissue*, it is imperative and urgent that GDC allow her to pad her bra so that she can present as her true gender, thereby further alleviating her gender dysphoria." (emphasis added)). So it would be irrational

to call the gender-affirming items a security risk when GDC prescribes HRT that will have the very same effects on Ms. Doe's body—and previously did.

For these reasons, the alleged security risks do not outweigh Ms. Doe's established medical needs for these items. Thus, the district court's balance of the equities and the determination that the public interest favors this outcome was not erroneous.

3.       *There was no undue delay barring injunctive relief.*

Finally, Defendants argue that Plaintiff's delay in seeking injunctive relief is fatal to her claim because it undermines her arguments about irreparable harm. AOB 33. As the district court held, Plaintiff's case history does not indicate any delay that should bar relief here. *See* Dkt. 31-3 at 56. In *Wreal, LLC v. Amazon.com, Inc.*, the main case on which Defendants rely, the plaintiff filed the motion for preliminary injunction five months after filing the complaint, with no explanation. 840 F.3d 1244, 1247–48 (11th Cir. 2016).[14] Because Plaintiff filed her motion for preliminary injunction the same day that she filed her complaint, *Wreal* is inapposite.

This case is more akin to *Wood v. Florida Department of Education*, --- F. Supp. 3d ----, No. 4:23-cv-526, 2024 WL 1536749, at *1 (N.D. Fla. April 9, 2024). The

---

[14] Other circuits have granted motions for preliminary injunctions filed eight or six months after the plaintiffs noticed a trademark infringement. *See Boldface Licensing + Branding v. Tillett*, 940 F. Supp. 2d 1178 (C.D. Cal. 2013) (granting motion for preliminary injunction filed eight months after infringement noticed); *Am. Beverage Corp. v. Diageo N.A.*, 936 F. Supp. 2d 555 (W.D. Pa. 2013) (six months).

district court there distinguished the case from *Wreal* and granted the preliminary injunction in part. *See id.* at *18–19. The plaintiff sought an injunction preventing enforcement of Florida legislation that had passed into law seven months before the lawsuit was filed. *Id.* at *19. The Northern District of Florida discussed this Court's precedent and stated that "[a] delay does not, as a rule, preclude a finding of irreparable harm. Instead, . . . each case hinges on the facts—the length of the delay and the reason, if one is given, for it." *Id.* at *18; *see also Larweth v. Magellan Health, Inc.*, 841 F. App'x 146, 159 (11th Cir. 2021) (finding that although "delay in seeking a preliminary injunction should be considered, it's 'not necessarily fatal.'" (quoting *Wreal*, 840 F.3d at 1248)). As described by the district court, the plaintiff took daily actions that violated the new law; raised her concerns with her county school board, school administration, then the Chief of Staff for her school district; and finally filed a lawsuit. *See Wood*, No. 4:23-cv-526, 2024 WL 1535749, at *19. "Based on the record at this stage, [the] Court [found] that Ms. Wood acted with 'reasonable diligence' in seeking preliminary injunctive relief." *Id.* at *20 (quoting *Benisek v. Lamone*, 585 U.S. 155, 159 (2018)). The *Wood* court's reasoning resembles the district court's discussion in Ms. Doe's case: "Far from spending the semester sitting on her hands, Ms. Wood engaged in a thorough dialogue at the local level—that is, with her school and her school district— to find a solution. That those efforts were unsuccessful does not undermine their validity as a reason for her delay." *Id.*

The district court assessed this issue reasonably. It found first that Ms. Doe *did* previously sue GDC closer to the time of the harm—when they "refused to restart her HRT or evaluate her for gender-affirming surgery." Dkt. 31-3 at 56. The district court correctly found that Ms. Doe "dismissed that case after one of her new doctors at Phillips recommended she be evaluated for" gender-affirming surgery. *Id.*; *see also* PSA-206 (arguing the point, citing Plaintiff's voluntary dismissal that stated there were "newly developing, favorable circumstances"). Ms. Doe also pursued non-litigation means of advocacy; the district court's order notes that "her attorneys 'submitted a letter to GDC in July.'" Dkt. 31-3 at 15 (quoting PSA-75). But even after her attorneys sent that letter, her issues didn't stop. Her HRT was suddenly removed by one of her treating physicians at GDC again in August 2023. *See* PSA-75. And in November 2023, Dr. Mulloy *reduced* Plaintiff's estradiol once more. PSA-13. Plaintiff filed her complaint only one month after this undue decrease in her HRT dosage, and filed the preliminary injunction motion at the same time as her Complaint. This timeline does not indicate any undue delay that would warrant denying the injunctive relief granted.

B.    The relief granted meets the PLRA's requirements.

Under the PLRA, a court cannot order prospective relief addressing prison conditions unless it "finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." 18 U.S.C. § 3626(a)(1)(A). This

is known as the "need-narrowness-intrusiveness" requirement. Whether a district court's injunctive relief meets this requirement "is determined with reference to the constitutional violations established by the specific plaintiffs before the court." *Brown v. Plata*, 563 U.S. 493, 531 (2011). In making the determination, courts are required to "give substantial weight to any adverse impact on public safety or the operation of a criminal justice system." 18 U.S.C. § 3626(a)(1)(A).

Defendants have invented a burden for Plaintiff with no case law or statutory support. The PLRA's need-narrowness-intrusiveness test "is a limitation on judicial authority over prisons at the remedial stage, not a heightened-pleading requirement imposed on the plaintiffs." *Henderson v. Thomas*, 891 F. Supp. 2d 1296, 1312 (M.D. Ala. 2012). The statute itself directs that the "court shall not grant or approve any prospective relief unless the court finds" that the test is met. 18 U.S.C. § 3626(a)(1)(A). This Court has read this provision in this way. *See Johnson v. Breeden*, 280 F.3d 1308, 1326 (11th Cir. 2002) (interpreting § 3626(a)(1)(A) as mandating district courts to "discuss [the need-narrowness-intrusiveness] factors and enter findings that are as specific to the case as the circumstances permit"). Responding to Defendants' argument on appeal that the district court's relief does not meet the test is thus the first time that Plaintiff must establish that it does.

The district court's need-narrowness-intrusiveness analysis was anything but a "rote, catch-all assertion." *Hoffer*, 973 F.3d at 1279; *cf. id.* at 1269 (determining that

the following sentence was boilerplate for the PLRA's test: "Finally, the permanent injunction satisfies the [PLRA] because it is narrowly drawn, extends no further than necessary to effect the changes this Court concludes are constitutionally required, and is the least intrusive means of effecting such changes."). Rather, it was particularized to Plaintiff's facts and Defendants' alleged security risks. *See* Dkt. 31-3 at 34 n.10 ("The relief the Court orders . . . respects GDC's judgment on security concerns and is narrowly tailored to provide Plaintiff with something Defendants agree is medically necessary to treat her gender dysphoria—that is, feminization of her body using cosmetic items while the HRT that Defendants also agree is medically necessary takes effect.").

Defendants focus in their brief on this footnote, but other sections of the district court's decision, which the footnote references in its logic, also discussed the narrow relief and the potential intrusiveness of the alleged security risks. At the text immediately before this footnote, for instance, the district court stated its finding that "Defendants do not identify any security risk posed by [padding and hair removal cream]." *Id.* at 34. The alleged security threat posed by breast and buttock padding was discussed extensively at footnote 8 and the surrounding text, as well. *Id.* at 31 n.8. Namely (as explained above), Plaintiff's own Warden permitted her to keep breast padding, defeating any argument that the district court ordering it would pose an inherent, intrusive security risk. And the district court found Defendants' argument

49

regarding the security risk of hair removal cream "mere conjecture." *Id.* at 31.

It strains credulity to find that this injunctive relief was not narrow. The district court denied the vast majority of Plaintiff's claims, including her requets for other gender-affirming items. *See id.* at 30 (denying wigs and makeup because the district court deferred to the "rational security concern warrant[ing] against requiring Defendants to provide Plaintiff those items"), 27 (denying claim for higher dosages of hormones), 42–43 (denying request for transfer to a women's prison), 43 n.13 (explaining the district court's agreement with Defendants that such a transfer would violate the need-narrowness-intrusiveness requirement). The district court's need-narrowness-intrusiveness inquiry was closely hewed to Ms. Doe's current medical needs established by her medical experts and GDC's treating physicians, narrowly specific to padding and hair removal cream, and took the intrusiveness of the alleged security risks into account—and properly discounted them.

## CONCLUSION

This Court should affirm the district court's preliminary injunction order and dismiss Defendants' appeal of the pseudonym order for lack of appellate jurisdiction. Alternatively, the court should deny Defendants' petition for a writ of mandamus.

Respectfully submitted this 2nd day of August, 2024.

*/s/ D Dangaran*
D Dangaran
Miriam R. Nemeth
RIGHTS BEHIND BARS
416 Florida Avenue N.W. #26152
Washington, D.C. 20001-0506
(202) 455-4399
d@rightsbehindbars.org
miriam@rightsbehindbars.org

Katie Jeffress
BAKER BOTTS, L.L.P.
401 S 1st Street Suite 1300
Austin, Texas 78704
(512) 322-2672
katie.jeffress@bakerbotts.com

Scott Novak
BAKER BOTTS, L.L.P.
700 K St NW
Washington, DC 20001
(202) 639-1316
scott.novak@bakerbotts.com

Nicholas F. Palmieri
BAKER BOTTS, L.L.P.
30 Rockefeller Plaza
New York, New York 10112
(212) 408-2640
nick.palmieri@bakerbotts.com

*Attorneys for Plaintiff-Appellee Jane Doe*

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 27(d) because it contains 12,736 words, excluding the parts of the brief exempted by Fed. R. App. P. 27(a)(2)(B).

I further certify that this brief complies with the typeface requirements of Rule 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word with a Times New Roman 14-point font.

Date:  August 2, 2024

*/s/ D Dangaran*
D Dangaran
Rights Behind Bars
416 Florida Avenue NW #26152
Washington, DC 20001
*Attorney for Plaintiff-Appellee Jane Doe*

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eleventh Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Date: August 2, 2024

*/s/ D Dangaran*
D Dangaran
Rights Behind Bars
416 Florida Avenue NW #26152
Washington, DC 20001
*Attorney for Plaintiff-Appellee Jane Doe*