

Rights Behind Bars
416 Florida Ave NW, #26152
Washington, DC 20001
**202-455-4399**

December 12, 2024

David J. Smith, Clerk of Court
U.S. Court of Appeals for the Eleventh Circuit
Elbert Parr Tuttle Court of Appeals Building
56 Forsyth Street NW
Atlanta, GA 30303

    Re: *Jane Doe v. Georgia Department of Corrections, et al.*, No. 24-11382-H

Dear Mr. Smith:

    Counsel for Plaintiff-Appellee submits this letter under Federal Rule of Appellate Procedure 28(j) in response to the astute question asked by Judge Marcus at the oral argument today, which neither party was able to answer. Attached is Dr. Levine's expert report submitted in *Keohane*, which shows that Dr. Levine examined that plaintiff and based his expert report on that evaluation.

    The district court rightly doubted the ability of Drs. Levine or Kaliebe to comment on the medical necessity of any of the gender-affirming care sought by Ms. Doe. Appellants' Appendix Vol. 6 (sealed), 2/13 Tr. at 286. The Eighth Amendment requires prisons to provide an individualized medical needs assessment rather than categorically bar a type of medical care. *See, e.g.*, *Kosilek v. Spencer*, 774 F.3d 63, 91 (1st Cir. 2014) (en banc). Defendants' attempt to read *Keohane* to allow such a categorical bar is misplaced.

    So, too, is Defendants' attempt to frame Dr. Levine's characterization of Ms. Keohane's requested care as "psychologically pleasing" as some sort of Eighth Amendment standard that this Court should apply to all social-transitioning items. As this Court stated, the items sought would be "'psychologically pleasing' to Keohane." *Keohane v. Fla. Dep't of Corr.*, 952 F.3d 1257, 1274 (11th Cir. 2020). This language cannot be removed from its specific medical assessment context and applied to Ms. Doe's requests without an evaluation of Ms. Doe. Such a step betrays the constitutional violation of Defendants' position in this appeal, given Ms. Doe's providers at GDC, *see* PSA-347 (sealed) ("Affording her basic

accommodations impacting her gender appearance may translate to a significant reduction in self-injurious behavior and minimize the patient's notable distress related to her gender identity."), and the only testimony from any expert witness to comment directly on the issue, *see* PSA 111-12—which the district court found credible, Dkt. 31-3 at 25—both support the district court's outcome here that the social transitioning items at issue are medically necessary in Ms. Doe's case.

This Court should not extrapolate Dr. Levine's comments about Ms. Keohane's care to Ms. Doe's care.

Respectfully submitted,

/s/ D Dangaran
D Dangaran
RIGHTS BEHIND BARS
1800 M St. NW
Front 1 #33821
Washington, DC 20033

*Counsel for Plaintiff-Appellant*

# CERTIFICATE OF SERVICE

I, D Dangaran, hereby certify that on December 12, 2024, I electronically filed the foregoing 28(j) letter with the Clerk of the Court of the United States Court of Appeals for the Eleventh Circuit by using the CM/ECF system. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

Date: December 12, 2024

/s/ D Dangaran

D Dangaran

Appeal No. 18-14096-H

IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT

---

REIYN KEOHANE,

Plaintiff/Appellee,

vs.

FLORIDA DEPARTMENT OF CORRECTIONS,

Defendant/Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF FLORIDA
No. 4:16-cv-511-MW-CAS

---

APPELLANT FLORIDA DEPARTMENT OF CORRECTIONS
APPENDIX – VOLUME I

---

| | |
|---|---|
| Daniel Russell | Kirkland E. Reid |
| William D. Hall | Attorney for Appellant |
| Attorneys for Appellant | Jones Walker LLP |
| Jones Walker LLP | 11 N. Water Street |
| 215 South Monroe Street, Suite 130 | Suite 1200 |
| Tallahassee, FL 32301 | Mobile, Alabama 36602 |
| Telephone: (850)425-7805 | Telephone:  (251) 432-1414 |
| Facsimile: (850-425-7815 | Facsimile:  (251) 439-7358 |
| Email: drussell@joneswalker.com | kreid@joneswalker.com |

# INDEX of APPENDIX

Docket/Tab#

District court docket sheet .................................................................................. A

Complaint filed August 15, 2016 ........................................................................ 1

Answer to Complaint filed November 2, 2016................................................... 54

Expert Report of George R. Brown, MD............................................................ 105-2

Expert Report of Stephen B. Levine, MD .......................................................... 105-4

Expert Report of Richard J. Subia ...................................................................... 129-17

Expert Report of James R. Upchurch ................................................................. 129-18

Expert Witness Rebuttal – James R. Upchurch ................................................. 129-20

Trial Day 1 Transcript ........................................................................................ 145 at 80-81

Trial Day 1 Transcript ........................................................................................ 145 at 201-207

## VOLUME II

Trial Day 1 Transcript ........................................................................................ 145 at 217-219

Trial Day 1 Transcript ........................................................................................ 145 at 223

Trial Day 2 Transcript ........................................................................................ 146 at 13-40

Trial Day 2 Transcript ........................................................................................ 146 at 48-50

Trial Day 2 Transcript ........................................................................................ 146 at 71-72

Trial Day 2 Transcript ........................................................................................ 146 at 75-76

Trial Day 2 Transcript ........................................................................................ 146 at 80-93

Trial Day 2 Transcript ……………………………………………….. 146 at 99-101

Trial Day 2 Transcript ……………………………………………. 146 at 129-130

Order on the Merits filed August 22, 2018 ……………………………………. 171

Certificate of Service

# TAB 105-4

# Expert Report of Stephen B. Levine, MD

**LEVINE, RISEN & ASSOCIATES, INC.**

*Stephen B. Levine, M.D.* \*  
*Candace B. Risen, L.I.S.W.* \*  
Co-Directors \*

Kristine M. Campbell, M.D.  
Erin B. Cooper, Ph.D.  
Cassandra Goodman, L.P.C.C  
Linda M. DeBalzo, MSN, CNS  
Larissa Elgudin, M.D.  
William C. House, Ph.D.

Tracie E. Luther, M.D.  
Anna Novak, L.I.S.W.  
Justin E. Shelton, Psy.D.  
Robert S. Weiss, M.D.  
Miki Wieder, M.A.  
Abraham W. Wolf, Ph.D.

6 January 2017

Dear Messrs. Lazaro and Desai:

Thank you for the opportunity to provide an expert opinion on the **Reiyn J. Keohane** matter. I interviewed the inmate on January 3, 2017 between 10:10AM and 2:45PM. I have read the records that your office provided to me. These included:

1. David Baker-Hargrove, Ph.D, LMHC, DAPA's Report dated 10/3/2016
2. Keohane's Grievance dated 05/04/2016
3. Dr. Dieguez's Response to Grievance dated 05/18/2016
4. Keohane's DOC medical records labeled Active Volume II
5. Supplemental medical records relating to endocrine therapy

## My Credentials

Please refer to my curriculum vitae for details. I have been providing care for the transgendered since 1974. I am Clinical Professor of Psychiatry at Case Western Reserve University School of Medicine. I have solo authored five books and edited five others. I have been the chairman for the writing of the 5th Edition of the Harry Benjamin Gender Dysphoria Association's Standards of Care. I have written 14 articles on the subject of transgender phenomena in referred journals, the most recent of which is entitled, <u>Reflections on the legal battles over prisoners with gender dysphoria</u> in The Journal of the American Academy of Psychiatry and the Law 44(2): 236-245, 2016. I have been a consultant to prisons in Massachusetts, California, Idaho, Virginia, and New Jersey and have provided testimony or reports in several trans inmate litigations.

*Related Legal and Educational Work*

In 2006, I testified in the <u>Kosilek</u> case as a judge's witness in the United States District Court for the District of Massachusetts. In 2008, I provided treatment plans for 12 previously evaluated prisoners in Massachusetts, all of whom received a recommendation for sex reassignment surgery from the Fenway Clinic in Boston. In 2008 I also provided an in-service day to mental health professionals employed in the prison system and assisted with the development of the Gender Identity Disorders clinic within this state's prison system. Since 2008, I have served monthly as a consultant to the Clinic's clinical

23425 Commerce Park Road, Suite 104 \* Beachwood, Ohio 44122-5446 \* Telephone 216-831-2900 \* Fax 216-831-4306

www.levinerisenandassociates.com or www.centerformaritalandsexualhealth.com

1

and administrative staff. In the fall 2016, I provided five hours of continuing medical education in Gender Dysphoria for a larger number of staff and officials there.

*Other Legal Involvement with Inmates*

1. Prisoner evaluation in Michelle-Lael Norsworthy v. Jeffrey Beard et al in February 2015. Submitted a report.
2. Prisoner evaluation in New Jersey in the Michelle Hel–Loki Angelina case October 2014. No litigation. Submitted a report.
3. Prisoner evaluation in Virginia in De'lonte v. Harold Clark et al. in April 2014. Prisoner paroled and law suit dropped.
4. Provided a rebuttal to a report by Dr. George Brown in the lawsuit in #3. Case was dismissed.
5. Provided two evaluations, depositions, and testimony in the Katheena Sonyeena litigation in Massachusetts.
6. Prisoner evaluation and deposition in Charlene Paige-Fuller v. Carol Higgins Obrien, Commissioner of Massachusetts DOC, in January 2016.
7. Named as 8th defendant by Plaintiff inmate Witkowski of Massachusetts in a suit to obtain estrogen after the inmate received hormone therapy. JoJo Witkowski vs. Steven Levine, et al Court/Docket Number: U.S. District Court, (1:14-cv-11107-NMG).

**My Compensation**

My compensation for this case is as follows:

**$200/hr.** for travel time
**$250/hr.** for reading, interviewing, discussion with attorneys, writing
**$350/hr.** for deposition or trial testimony

**Identifying Information**

Reiyn J. Keohane is a 22 year old, never married Caucasian transgender identified woman currently housed in the Everglades Correctional Institution, a state prison for males. Reiyn has a GED. Reiyn never completed any other educational program. Reiyn understood that our interview was going to culminate in a report and that nothing we were to speak about was confidential.

**The Pronoun Problem**

I have made a concerted effort to refer to the inmate with female pronouns. I use this obvious retrospective falsification out of respect for the inmate's current gender identity. It inevitably creates, however, awkwardness when referring to a boy or adolescent as she. Reiyn expressed appreciation for my efforts in this regard and gave me an analogy to she felt would explain the level of intensity of her gender identification. [**Reiyn**]: "One can say one wants a Ferrari and plan to have one when older, but at a certain point in order to

2

obtain the car, the person has to give up many other things in order to save for this expensive purchase. There was a time that I thought I wanted to be a girl and said that I was one, but after a while I had to put it into high gear, made the sacrifices and declared myself female at a deeper level than previously. I want the Ferrari!" Any grammatical lapses in this report should not be interpreted as lack of compassion towards this tragic individual.

**What Reiyn Wants**

[**Reiyn**]: "I want everything that is available to Florida's female inmate population. No regulation of hair length, underwear, cosmetics, clothing and hair products. This is because I am a woman at this point in my life. Eventually, I want to have beard removal from the edge of my sideburns down and one year after being on hormones, genital surgery. I will fight for this and if I lose the fight at the US Supreme Court, I will then kill myself. I want my hair to be a decent length at the shoulder. I can't live with my hair the way it is. I feel dysphoric, sick, disgusted whenever I am associated with maleness. Short hair, genitalia, and references to me as he and him create a pit in my stomach and create a discomfort that is beyond explanation."

**The Crime**

Reiyn (pronounced Rain) has served two+ years of a 15-year sentence for attempted murder of a female roommate. Their growing tension precipitated into an intense argument when Reiyn told her to immediately leave the apartment that they had shared for four months beginning in summer 2013. For the first three months it was okay but then the roommate returned to the use of methamphetamines. They had been occasional sex partners during these months. Their Internet relationship began much before. (Most of Reiyn's relationships began on the Internet.) The roommate confessed to Reiyn via computer that her North Carolina boyfriend/roommate was forcing her to have sex. Eventually, Reiyn, "being a good feminist", rescued her by buying her a plane ticket and making a deal that Reiyn would pay for food and the expenses of helping her get a job and she would clean the apartment until she could pay her way. When the roommate obtained food stamps this was used to buy their food as well. Each was involved with a Canadian Internet friend Dylan, whom the roommate erroneously thought Reiyn was becoming romantically interested in and was secretly competing with her. The roommate's deteriorated housekeeping reached a breaking point for Reiyn when Reiyn found hidden garbage that was never taken out of the apartment and a pot of rotting chili placed in the cabinet rather than the refrigerator. The violence ensued after the roommate begged Reiyn to not throw her out. When Reiyn persisted an hour later during which the roommate had showered and dressed, the roommate discovered that Reiyn had packed her bags. She screamed, "You are not a woman and you will never be!" The roommate moved toward a loaded shotgun on a nearby desk. When Reiyn stopped her, she took the K-Bar Marine knife from Reiyn's belt.

Today, Reiyn said she did not attempt to kill the roommate: [**Reiyn**]: "It was self-defense. In restraining her hand with the knife in it with my two hands, I acidently stabbed her in

3

the waist area. She ran out to the balcony. When she returned we struggled with the knife again and she got stabbed in the shoulder area. I tried to give her first aid and call 911, but she refused and yelled for help from the balcony." Panicked Reiyn ran to her parents, having grabbed an ammunition magazine thinking it was her wallet. She took $50 from sleeping parents' home and left a note. Before she could leave, the police were at the door. After a year in jail, Reiyn accepted a plea bargain for the current sentence.

Reiyn is hoping that a retrial will one day free her from prison. Her parents, with whom she has never spoken of the crime, are apparently working on an appeal. Reiyn's parents visit 1-2/month for three-four hours and call several times a week.

**From Brendan to Jamie to Reiyn**

Reiyn Keohane is not her original name. "I hated Brendan so I took my middle name James and made it Jamie." She chose the name because she learned last year that her biological mother was Jewish. Reiyn derives from Celtic Norman word for warrior queen. Keohane is an Irish version of Cohen and Kohane who are a privileged tribe among the Israelites who had elevated religious ritual responsibilities in the original Temple. In this way, Reiyn explained, that she pays honor to both Irish and Jewish heritages, particularly through the concept of warrior. However, in a different moment in the interview, Reiyn said her name change occurred at 16.

**Her Physical Appearance and Mental Status**

Five feet 10 inches, slender, without feminine mannerisms, Reiyn has shaped long fingernails, three tattoos on left upper arm, wears glasses and has soft slightly curved brown hair that does not reach the ears. Reiyn looks neither masculine nor particularly feminine. She is articulate, talks easily without a range of affective intensity. Reiyn did not cry or get angry but reported these feelings in the past. Reiyn admitted that the story told to me has been has told many times to people like myself. [**Reiyn**]: "I will only cry when I win my lawsuits; I cry only on happy things not sad things since I have been incarcerated. Even before, with the exceptions of movies, I don't allow myself to cry. I'm tough!"

**Current Happiness**

Reiyn is considerably happier now that hormones have been prescribed. [**Reiyn**]: "I am not suicidal as long as I have hope I can live as a female. I'm less angry and less frustrated. I can be more myself. I like my figure more. My breasts are budding (wears a tee shirt under male inmate top)." Reiyn claims that she does not fear the inmates, just the corrections officers who can punish her by putting her in the box, which is a terrible experience, and limits time off the sentence for good behavior. Reiyn states that it is vital that her transgender state be respectfully acknowledged. The name change helped. She claims not to have any Disciplinary Reports recently. It also helps to have a fiance in the dorm who cares, protects and loves Reiyn enough to promise to marry if he can get out of

4

prison (He is serving a life sentence). The fiance is an older heterosexual man. Reiyn has always preferred older children as friends as a child.

Reiyn expects to prevail in this lawsuit. The awareness of recent legal precedents contributes to her happiness and behavioral stability.

**Attitude to Others**

Reiyn has taught classes to inmates in order to pass their GED. She generally does not like other people, distrusts them, and has painful memories of bullying. An episode of forced fellatio when Jaime was age 14 "traumatized me for a long time until recently." Reiyn denies this is paranoia; rather the distrust stems from sensing that others do not know what her gender is, assume she is a male, or quickly dismiss her because she is trans. "It is just easier to avoid people." Reiyn claims to have had many friends, boys and girls, in childhood even though as a boy he preferred girls because of their interests and lack of aggressiveness. When kids did not seem to like him before coming out as a girl, it was **[Reiyn]:** "because I was smart and acted superior to them at times. As a child I consistently thought I was a girl. This made it hard for me because I was mentally against everyone. They are wrong, stupid idiots who cannot accept that you are a girl and they caused me anxiety and antisocial behavior. I was never girly. I liked outdoor sports. I was more like a tomboy in how I related to other kids. I thought boys were stupid but I did boy things better than they did. I skateboarded, made 100s on my tests, hunted, camped and played dress up with girls from kindergarten until 8th grade."

Friendship patterns changed once a former best friend told others of her trans nature in eighth grade. Eventually, the mortification of being known caused a refusal to return to school. Although she never completed a school after four additional attempts, the last one was the best, a small academy that provided advanced courses in which Reiyn excelled when interested in the subject. Reiyn's internal gender identity conflicts were the typical reason for dropping out of these four schools as Reiyn had strong feelings about how other people felt about her. When not in school, Reiyn spent much time in her bedroom on the Internet connecting with other trans teenagers and learning about the subject in detail. Reiyn's new friendships many of which involved sexual liaisons all from these Internet acquired relationships.

**Reiyn's Passions**

Reiyn feels that she understands her rights as a trans person and can quickly become passionate when she feels corrections officers are violating them. This has been a major source of her past frustration and anger while in custody. She is proud that she was given a Disciplinary Report for harming property (smoke alarm) and she fought it and proved her innocence in a trial. Reiyn thinks that inmates generally don't like her because of Reiyn's sense of being intelligent and superior. "I am!"

**Sexual Identity**

5

*Gender Dysphoria* is both a psychiatric DSM-5 diagnosis and a label for a set of symptoms based on the incongruence of gender identity and genital anatomy and secondary sex characteristics. The fact that Reiyn is on hormones means that others have diagnosed the inmate as having met the DSM-5 criteria. There is no other diagnostic description of the inmate's gender identity development as a child and adolescent in my opinion. However, gender identity is only one of three aspects of sexual identity. The other two aspects, orientation and intention, were not commented upon in Dr. Baker-Hargrove's report. When I described sexual identity as a mosaic in everyone, Reiyn quickly agreed that she certainly was a collection of things; of which only gender identity was certain.

Reiyn told me that she simply lied about some of her history when she was initially evaluated in custody in summer 2014. I, or anyone else, as a result, cannot be certain that Reiyn is revealing the relevant truth to me.

Reiyn's personal version of bodily distress seems to begin with penile dysphoria at the onset of puberty at 13. [**Reiyn**]: "The idea of standing to urinate disgusts me. As a child I always sat down to urinate. I was horrified at my earliest facial hair growth but not nearly as horrified as from morning erections. The deepening of my voice troubled me." Reiyn claims never to have had a nocturnal emission. Reiyn masturbated about weekly without an erection, preferring not to see or feel a hard penis. The sight of typical male masturbation made him sick to the stomach. Reiyn learned to lay a hand over the penis and indent the perineum until a weak orgasm with clear, not milky fluid, was attained. "I touch myself as a girl does." Reiyn is relieved that spontaneous erections have not been present since about age 18. All the psychiatric medications that were ingested never negatively affect the ability to erect. Reiyn noted that her serum testosterone level used to be low but a physician never worked it up.

Reiyn claims that she wore panties and a bra throughout his adolescence. Reiyn has shaved her arms and legs throughout adolescence. This did not make Reiyn feel more like a girl; it only made Reiyn feel more comfortable. Her outerwear varied a lot during adolescence as she went through various stages. She once dyed her hair purple but she tended toward neutral ambiguous clothing—"like an office drone."

Once in Charlotte County Jail, Reiyn was put in a box for five days without the ability to shave. She became so obsessed with her whiskers that in an attempt to pull the facial hair out by its follicles, Reiyn's fingertips were blistered, bloody and callused.

*Orientation.* Teenage Reiyn watched a variety of pornography just to learn what others did; it was never arousing. Reiyn only focused on the people's connection. [**Reiyn**]: "I watched it clinically. I watched girls and boys masturbate. I was not really interested. It did not make me want to be a girl. I am a bit attracted to girls but only when we have a strong relationship first. Romance excites me, not a female or male body per se. I am not attracted to bodies. The relationship with my fiance causes some distress because others may think it to be homosexual. If we could live outside of prison, I would be his wife

6

and I would love to have kids. Both of us were adopted so we would be fine with adopting children."

*Intention.* This sexual identity component developed in response to her use of the Internet. She chatted and Skyped with a variety of girls and fewer males, some of whom were older. They masturbated; I watched. Many of them were into BDSM (bondage, dominance, submission, and masochism). These led to in-person mutual exchanges of flogging, tying up, and spanking. Humiliation had its limits; Reiyn would not play excretory games. Pain was not bad but anal receptivity was too painful. Reiyn did not like being choked while performing fellatio. Reiyn practiced mindfulness—trying to think of nothing during sex. Reiyn claims to have no sexual fantasies, although he writes them in stories for others. [**Reiyn**]: "I write for the other persons to make them happy. I never wanted anyone to do anything to my body. Many girls wanted also to have intercourse with me. When I tried, my erection always faded. I have no real lasting personal interest in BDSM other than to please the partner. I just want to please the person I am with. My fiance likes to spank me occasionally. I don't mind if it makes him happy."

### God Make Me This Way

Reiyn claims that she had a normal childhood until age 13. Reiyn was adopted at 11 days by older parents who searched for four years through an agency for the right child. Reiyn's parents were happily married, now 30 years together. No one physically, psychologically or sexually abused Reiyn. Neither Reiyn nor his parents suffered any serious illness or separation from one another. Reiyn has no explanation for the trans state other than God make him this way.

### The Turning Point of His Academic Life

He did not share with his parents all along that he wanted to be a girl; they were shocked when he announced he wanted to live as one. As a child, Reiyn liked to play with boy things, like shooting, camping, fishing, and hunting. Three generations of Reiyn's family liked the outdoors. Reiyn liked soccer but not contact sports. He thought small animals like bugs were disgusting, however. He told his best friend in 7th (? 8th) grade of their Lutheran school the secret that he felt he was a girl. The boy betrayed his confidence by telling others. Peers called him a "faggot" and said he would burn in hell. A bully, "big dumb Mitch", with whom he previously had a few fights, during which no one came to his rescue, harassed him about this. Reiyn took eventually revenge by throwing him down a stairwell. "If I had my knife with me, I would have killed him!" Reiyn's humiliation led to school refusal, despite his high grades and apparent group of friends of both sexes. [**Reiyn**]: "It was a good choice to leave school. I would just have to kill someone if I stayed. It also led to my loss of interest in religion. Thereafter, I refused to take religion classes and took a study period instead."

This event brought psychiatric care and transfer to two other public schools in the area, but he could not tolerate them and refused to return. Then, he was sent to a wilderness

7

experience with a "bunch of juvenile delinquents." There a taller stronger boy forced him to perform fellatio on him under the threat of death and told Reiyn that he would kill him if Reiyn reported about it to anyone. The impact of this traumatic experience lasted until incarceration. After this episode at wilderness, Reiyn told his parents only about the wish to be a girl.

Finally his parents put him in a smaller academically more rigorous school for smart kids with psychological problems. Despite academic success and a few friends there, Reiyn dropped out because his mother's refusals give the physician permission for hormones at $15^{1/2}$. In a rage, Reiyn made a manipulative suicide gesture with alprazolam and set a fire in his room. He was psychiatrically hospitalized for three days. "I did not want to die then." Two months later, however, when the mother again refused to sign until he could get them on his own at age 18, Reiyn wanted to die. "I did not want to live without hormones. I ended up in the ICU in a near coma after a Tylenol PM ingestion." This apparently ended the high school experience. His psychiatric treatment with various drugs, including Ability, added to his coping by eating until he was 100 pounds over his last suicide attempt weight of 145 lbs. When a doctor told Reiyn it was too dangerous to give him hormones because of his obesity, Reiyn stopped his psychiatric drugs, lost 100 pounds and grew two inches. At 19, she was prescribed hormones, which pleased her. She moved out of the family house into a solo apartment using the college fund of $120,000 to sustain independence. Reiyn's plan was to request genital surgery at age 20 and then join the Marine Corps as a woman.

**Life Out of School**

Since much of the time between 14 and 19 she was out of school, she functioned socially via the Internet where she read about trans people, talked with them, joined virtual and in person LGBT support groups. She attended one such group at a nearby college where she planned to attend if the Marine Corp option did not work out. These groups strengthened her resolve that she was a trans person, a woman actually, and it was the right decision. The self-study of gender on the Internet and this immersion in the trans communities clarified where Reiyn fit into the universe—"I am a trans person."

Reiyn made a little money selling bit coins, selling currency for War Craft video game, and doing webcam phone sex. It never was enough to cover expenses but it allowed Reiyn to spin fantasies that the callers wanted. None of the stories excited Reiyn. The excitement derived from knowing what to write for others or sensing what to say to others to excite them. Reiyn's value was for others' pleasure.

**The Knife, Loaded Gun, and Distrust**
In the brief period of independence from parents that began in March 2013, Reiyn always carried a Marine Corp knife attached to a belt. "No one will ever abuse me again." She kept a loaded shotgun on a desk because trans people have the highest rate of being murdered and the apartment was in a bad neighborhood. At the time of her arrest, Reiyn was two months into martial arts training. "I never had a chance to get good at it."

8

[**Reiyn**]: "People are out to get you. I don't want to be helpless. I am not a victim. I am responsible for me. I don't trust people. God made me trans so I can learn what it is to live on both sides of gender. Pain causes a person to be stronger. One has to go through fire to be stronger!"

## Religion

[**Reiyn**]: "My parents are not religious. I have studied religions and identify with Buddhism, Witchcraft, Catholicism and Judaism. I believe in the magnificence of the creation. I am definitely not an atheist. Religion, like gender roles, does not have to be only one thing. I don't have any gender roles. A woman can do what she wants. I follow the first rule of wizardry: people are stupid. They believe not in reality but what they want to believe. I have to check myself, and my beliefs. My spirit animal is a fox. The fox tattoo will be resumed when I find a better tattooist." Reiyn stopped her current tattooist because he was not that good at it.

## Informed Consent

Initially, Reiyn did not understand the term informed consent. We then reviewed the dangers of hormones, which Reiyn understood, but then said that being a young healthy person, these events will not happen to her. "I am willing to take the chance because living 30 years as a woman and dying of heart disease is better than living a million years as a male." Reiyn had no concern about the loss of fertility and told me that the sexual pleasure of orgasm was, in fact, increasing on estrogen, not diminishing. About the risks of sexual harassment and rape while in prison as her body feminizes, Reiyn was not concerned. My fiance protects me. About the risks of: feeling neither male or female, inauthentic in either role in the future; post SRS suicide, depression; vocational disability; difficulty finding a lasting love relationship, Reiyn dismissed all of these. When told of the data that suggest these are actually outcomes in the psychiatric literature, Reiyn boasted that "I am the 1% who can handle these things; I am not like those Swedes. I am strong, a warrior, forged by past suffering. St. Paul taught that greatness can come from suffering and humility. I believe him and am like him. Rape and harassment have not been a threat anywhere I have been incarcerated."

## The Anxiety Paradox of Reiyn's Identity and Its Self-Treatment

In childhood, this boy wanted to be a girl. After puberty Jamie knew she was one. Unwavering, Jamie fought all comments and people who doubted that she, in fact, was a girl. The penis had nothing to do with her identity. [**Reiyn**]: "I was not a woman trapped in a man's body. I ignored my penis most of the time, did not look at it, and avoided having any sex partners touch or even see it. I was a female; I am a female. I don't trust anyone who does not see it this way. In society I could dress in any way I desired; I had long hair, wore makeup, had a stuffed bra and panties. I passed well. No one took me for a teenage boy. But I had considerable fear that I would be read and rejected. This came with the ambition to be a girl and intensified whenever I presented myself as a girl.

9

Two things quelled my anxiety about socialization—alcohol and Xanax, the latter, however, made me sleepy so I relied heavily on alcohol throughout my teenage years until my arrest. I tried all the other drugs but I am not an addictive personality. None of them really helped me to calm myself; they speeded up my already too fast mind. I did not like them. I used marijuana when others were smoking it but not by myself. It only enabled me to fit in with others and talk to cis(gender) people."

When asked about the impact of psychiatric treatment on the social anxiety, Reiyn dismissively laughed and moved on.

**Character Traits**

Reiyn displays certainty, optimism, arrogance, confidence, and entitlement. Although she aspires to humility, and is disdainful of so many other people, Reiyn seems to fit the first rule of wizardry that she quoted: "People believe in what they want, not in reality." Reiyn's stubborn persistence with the trans identity has cost her mightily. Reiyn has zealous beliefs in her rights as a trans inmate. Obstacles only make her stronger, she argues. Reiyn believes that her identity of a woman means the prison is obligated to make life as comfortable as possible for her.

Reiyn has a masochistic nature. She has sublimated what was, for a number of years, overt sexual masochism into a long-suffering non-sexual adaptation. Her feminine identity contains two contradictory identities. The first is that she feels that she is the activist warrior feminist rescuer queen—powerful, strong, demanding, and dominant. The second is that she is willing to passively be anything that anyone would like her to be as long as that person will acknowledge that she is an actual woman. This identity aspires to erase herself ("I meditate during sex to clear my mind of everything.") and make herself in whatever the valued other wants her to be. Context determines which aspect of her femininity is actualized.

Reiyn has been described in medical charts as having a character disorder with mixed and changing features. I experienced the inmate as a grandiose, narcissistic, stubborn, masochistic, and socially phobic.

Reiyn is not mentally ill in terms of evidence of psychosis, bipolar disorder, or autism for the purposes of prison mental health care. Her character patterns have narcissistic and paranoid features that continually create serious problems for Reiyn. Legal successes will keep Reiyn happy, but the warrior queen may be vulnerable to acute decompensations when thwarted by prison security concerns.

She was taken aback when I commented on the last five words of this sentence: "This is because I am a woman at this point in my life." [**Levine**]: "It seems from these words that you uttered that you may be aware that trans people can change their minds and return to the male role. I told her of one of my patients who did so after 30 years as a woman. Your sentence implied that you realized that your trans state was simply part of your evolution as a person. Who knows where it may lead?"

10

She did not want to dwell upon the subject so I did not.

**Medical Necessity**

To qualify for medical necessity, a physician recommends a data-supported reasonable procedure that can: Prevent death; Prevent complications; Relieve pain; Improve capacity to function. For most medical and surgical problems it is not a difficult determination. Many experts do not find medical necessity to be difficult judgments for trans inmates—it is as though once Gender Dysphoria, the diagnosis, is established everything the inmate wants is medically necessary. The term, which has its historical roots in the insurance industry, was originally employed in the transgender field to calm the ethical concerns of endocrinologists and surgeons about changing or removing healthy tissues. By invoking medical necessity, it is as though health professionals are saying there is no ethical concern about doing harm because it is the treatment for a serious medical condition. Gender Dysphoria is a psychiatric condition. Using the term medical necessity puts experts into uncomfortable positions.

There is nothing medically necessary about hair length. Women have short hair! If the inmate wanted hair to her waist instead, would this be medically necessary as well? Reiyn dreads having to get a buzz cut, the standard issue for male inmates. This is not a medical issue. Nor is the wearing of women's underwear. This is not to deny that anything Reiyn now wants will lessen her frustration that comes from not being perceived by others as a woman. If the DOC grants her requests, Reiyn will be happier. A padded bra is not medically necessary, but today it may be a compassionate accommodation to the complexity of her inescapable psychological predicament. No physician or psychologist needs to actually be involved in the decision to wear panties. Panties will not determine how others perceive Reiyn, although a padded bra may. Once visible breasts appear, a bra is likely to assist with safety concerns because glimpses of her breasts, particularly nipples, are apt to excite some of the inmates.

Reiyn possesses a fixed belief that she is a woman. That belief does not register in her as posing any danger in prison. Ironically, she was quite aware of the danger of the expression of that belief in the general public. She does not appreciate the safety concerns of the DOC. She denies the risk of rape in prison, although as she feminizes overtly, more vigilance may be required and she may change her mind. She obviously does not have a knife or gun to create the illusion that she can protect herself. She is likely to be kidding herself about the safety that another inmate provides.

The employment of the term medical necessity is useful for diseases such as: prostate cancer, asthma, and fractured tibias. It is, however, confusing for this culturally young, complex psychological state of suffering called Gender Dysphoria. I suggest replacing the term medical necessity with *psychologically helpful* or *psychologically pleasing to the inmate* would help all concerned to see the matter at hand more clearly.

11

Prison officials have the responsibility to ensure the safety of inmates. Officials have to determine what accommodations to the transgendered are risk neutral and risk enhancing to their safety.

**Recommendations**

I recommend a compassionate response to Reiyn's requests which take into account the security related concerns of the prison setting. I think it would help Reiyn psychologically to know that when she needs a haircut it does not have to be a buzz cut. Officials who determine safety issues should be asked to define a safe hair length for her. I am aware that male prisoners elsewhere have longer hair. Similarly, as her breasts increase in prominence, she should wear a bra. She already has permission to shower alone, so that issuing panties might be considered along these same lines. It is psychologically kind to allow her to shower alone without having male inmates looking at her feminizing body, commenting on it, or touching it. This already is the result of a safety concern. Any accommodation should take into account security issues of the prison in which she resides.

Any accommodation to Reiyn will be interpreted as a victory for the warrior queen, but it will not erase her wishes for more. I suggest that her requests be rejected on the basis of medical necessity but can be considered on the basis of the DOC's accommodation to a person who mishandled her life, limited her potential, and violently got herself into prison through a series of poor judgments. Nothing can change these facts. The DOC, within safety parameters, could consider her requests.

If, in the future, I have access to new material on Reiyn or I have a chance to talk with her further, I reserve the right to amend my current conclusions. Based on the information that I have at my disposal at the current time, I offer my recommendations within a reasonable degree of medical/psychiatric certainty.

Sincerely yours,

*Stephen B. Levine*

Stephen B. Levine, MD

12